**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT of PENNSYLVANIA**

| | |
|---|---|
| DALLAS TORGERSEN, derivatively on behalf of EVOQUA WATER TECHNOLOGIES CORP., | |
| Plaintiff, | Case No.:   2:19-cv-410 |
| vs. | |
| RONALD C. KEATING, BENEDICT J. STAS, MARTIN LAMB, JUDD A. GREGG, HARBHAJAN BHAMBRI, GARY A. CAPPELINE, BRIAN HOESTEREY, VINAY KUMAR, and PETER M. WILVER, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| EVOQUA WATER TECHNOLOGIES CORP., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Dallas Torgersen ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Evoqua Water Technologies Corporation ("Evoqua" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Ronald C. Keating, Benedict J. Stas, Martin Lamb, Judd A. Gregg, Harbhajan Bhambri, Gary A. Cappeline, Brian Hoesterey, Vinay Kumar, and Peter M. Wilver (collectively, the "Individual Defendants" and together with Evoqua, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Evoqua, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Defendants, Plaintiff alleges the

following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Evoqua, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Evoqua's directors and officers between November 6, 2017 and October 30, 2018, both dates inclusive (the "Relevant Period").

2.      Evoqua purports to be a leading provider of mission critical water treatment solutions, offering services, systems, and technologies to support customers' full water lifecycle needs. With over 200,000 installations worldwide, the Company holds leading positions in the industrial, commercial, and municipal water treatment markets in North America. Evoqua claims that the customer intimacy created through its service network is a significant competitive advantage.

3.      Evoqua was incorporated in 2013 and is headquartered in Pittsburgh, Pennsylvania. Evoqua's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "AQUA."

4.      During the Relevant Period, the Individual Defendants personally made and/or caused the Company to make a series of materially false and/or misleading statements and omissions regarding the Company's business, operations, prospects and legal compliance.

Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that the Company: (1) was experiencing disruptions in its supply chain due in part to a prolonged delay in a substantial aquatics project and tariffs; (2) was unable to effectively assimilate its prior acquisitions; and (3) failed to maintain internal controls.

5.      Furthermore, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations while four of them engaged in insider sales, netting proceeds of over $12.1 million.

6.      Approximately 18,000 shares of the Company's stock were repurchased at inflated prices between October 1, 2017 and September 30, 2018 for approximately $230,000.[1] As the Company's stock was actually only worth $9.02 per share, the price at which it was trading on October 30, 2018, the Company overpaid approximately $67,640 in total. These repurchases were disclosed in the Company's Form 10-K that was filed with the SEC on December 11, 2018 and was signed by all of the Individual Defendants.

7.      As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.  The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

8.      Moreover, the Individual Defendants failed to maintain internal controls.

9.      In light of the Individual Defendants' misconduct, which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO"), among

---

[1] Upon information and belief, these shares were repurchased during the Relevant Period.

others, to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

10.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the liability of certain of them in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of Evoqua's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j, 78t, and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

16.     Venue is proper in this District because Evoqua and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

17.     Plaintiff is a current shareholder of Evoqua.  Plaintiff has continuously held Evoqua common stock at all relevant times.

**Nominal Defendant Evoqua**

18.     Defendant Evoqua is incorporated in Delaware, and its stock trades on the NYSE under the ticker symbol "AQUA." The Company's corporate headquarters are located at 210 Sixth Avenue, Pittsburgh, Pennsylvania 15222.

**Defendant Keating**

19.     Defendant Ronald C. Keating has served as the Chief Executive Officer and as a Director for Evoqua since December 2014.

20.     The Company's Schedule 14A Proxy Statement states the following about Defendant Keating:

> Ron C. Keating has served on our Board and as our President and Chief Executive Officer since December 2014. Prior to joining Evoqua, Mr. Keating was President and Chief Executive Officer of Contech Engineered Solutions, an infrastructure site solutions provider, from 2007 to 2014. Before heading Contech, Mr. Keating served as President of the Metalworking Solutions and Services Group of Kennametal Inc. (NYSE: KMT), a supplier of tooling and industrial materials. He had also held previous roles at Kennametal as the Vice President and General Manager of the Energy, Mining and Construction Group and for the Electronics Products Group from 2001 to 2007. Mr. Keating started his career at Ingersoll-Rand Inc. in 1992 where he held various roles of increasing responsibility until departing in 2001. Mr. Keating currently serves on the board of directors and the Compensation and Corporate Governance committees of US Ecology Inc. (Nasdaq: ECOL). Mr. Keating also serves on the board of trustees for the Manufacturers Alliance for Productivity and Innovation, and the board of directors of the Allegheny Conference. Mr. Keating received an M.B.A. from the Kellogg School of Management at Northwestern University and received a B.S. in Industrial Distribution from Texas A&M University.

21.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Keating made only one purchase of company stock on November 6, 2017, the first day of the Relevant Period: a purchase of 3,000 shares at a price of $18.00, for a total value of $54,000.  Defendant Keating did not make any further purchases during the Relevant Period and instead sold more than $7.2 million worth of company stock. On March 19, 2018, Defendant Keating sold 294,149 shares at price of $21.29 for a total value of $6,262,432. Two days later, on March 21, 2018, Defendant Keating sold 44,122 shares at a price of $21.29 for a total value of $939,357. Defendant Keating's next purchase of Evoqua stock would not be until November 30, 2018, one month after the release of the fourth quarter financial results for the 2018 fiscal year. Defendant Keating purchased 24,236 shares at a price of $8.99, a price less than half of that at which he sold shares in March 2018, for

a total value of $217,978. Thus, in total, before the fraud was exposed, he sold 338,271 Company

shares on inside information, for which he received approximately $7.2 million.

22.     Defendant Keating has received and continues to receive lavish compensation for

his roles within the Company, most recently receiving $12,283,463 in compensation during the

2018 fiscal year.

**Defendant Stas**

23.     Defendant Stas has served as the Company's Executive Vice President, Chief

Financial Officer, and Treasurer since March 2015.

24.     The Company's Schedule 14A Proxy Statement states the following about

Defendant Stas:

> Benedict J. Stas has served as our Executive Vice President, Chief Financial Officer
> and Treasurer since March 2015. Prior to joining Evoqua, Mr. Stas held a variety
> of senior financial and business roles at Kennametal Inc. (NYSE: KMT), a supplier
> of tooling and industrial materials, from 1997 to 2015, including roles as Vice
> President Finance of Business Groups from 2010 to 2013 and as Vice President of
> Manufacturing for the Industrial Segment from 2014 to 2015. While at Kennametal
> Inc., Mr. Stas also served as Chief Financial Officer of the Industrial Business
> Group, Chief Financial Officer of Kennametal Europe GmbH, Director of Global
> Manufacturing Finance, Controller of Metalworking Americas, and Senior
> Financial Analyst for Global Financial Sales and Marketing from 1997 to 1999.
> Prior to joining Kennametal Inc., Mr. Stas worked for DuPont Co., as a Plant
> Controller, Accountant and Team Leader, from 1991 to 1997. Mr. Stas received an
> M.B.A. from Duquesne University and received a B.S. in Business Administration
> from Drexel University.

25.     During the period of time when the Company materially misstated information to

keep the stock price inflated, and before the scheme was exposed, Defendant Stas made the

following sales of Company stock (and made no purchases of Company stock). On March 19,

2018, Defendant Stas sold 86,950 shares at a price of $21.29 for a total value of $1,851,165. On

March 21, Defendant Stas sold 13,043 shares at a price of $21.29 for a total value of $277,685.

Defendant Stas' next purchase of company stock was not until November 30, 2019, one month

after the release of the fourth quarter financial reports, at which time he purchased 8,000 shares at

a price of $9.02, less than half the price at which he sold stock in March 2018, for a total value of

$72,184. Thus, in total, before the fraud was exposed, he sold 99,993 Company shares on inside

information, for which he received approximately $2.1 million.

26.     Defendant Stas has received and continues to receive lavish compensation for his

roles within the Company. During fiscal year 2018, Stas received a base salary of $410,000.

**Defendant Lamb**

27.     Defendant Lamb has served as the Chairman of the Company's Board of Directors

since March 2014.

28.     The Company's Schedule 14A Proxy Statement states the following about

Defendant Lamb:

> Martin J. Lamb joined our Board in, and has served as Chairman of our Board since,
> March 2014. Mr. Lamb, a retired engineering/industrial services executive, spent
> 33 years at IMI plc (LON: IMI), an engineering company which designs,
> manufactures and services highly engineered products that control the precise
> movement of fluids, including as its Chief Executive Officer for the last 13 years
> until his retirement in 2013. In June 2014, Mr. Lamb joined Rotork plc (LON:
> ROR), a global designer and manufacturer of industrial valve actuators, control
> systems and accessories, as its Non-Executive Chairman, and led the organization
> as its Interim Chief Executive Officer from July 2017 through March 2018. Mr.
> Lamb also served as a Non-Executive Director on the boards of Mercia
> Technologies PLC, an investment group, from 2015 through September 2017;
> Severn Trent plc (LON: SVT), from 2008 to 2016; and Spectris plc (LON: SXS),
> from 1999 to 2006. Mr. Lamb is a member of the European Advisory Board of
> AEA. Mr. Lamb received a B.S. in Mechanical Engineering from Imperial College,
> London and an M.B.A. from Cranfield Business School.

29.     During the period of time when the Company materially misstated information to

keep the stock price inflated, and before the scheme was exposed, Defendant Lamb made the

following sales of Company stock (and made no purchases of Company stock). On March 19,

2018, Defendant Lamb sold 93,765 shares at a price of $21.29 for a total value of $1,996,256. On

March 21, Defendant Lamb sold 14,065 shares at a price of $21.29 for a total value of $299,443. Thus, in total, before the fraud was exposed, he sold 107,830 Company shares on inside information, for which he received approximately $2.2 million.

30.     Defendant Lamb has received and continues to receive lavish compensation for his roles within the Company. During fiscal year 2018, Lamb received $206,119 in total compensation. Defendant Lamb also holds 3,968 restricted stock units, which fully vested on February 28, 2019.

**Defendant Gregg**

31.     Defendant Gregg has served on the Company's Board of Directors since March 2014.

32.     The Company's Schedule 14A Proxy Statement states the following about Defendant Gregg:

Senator Judd A. Gregg has served on our Board since March 2014 and was initially recommended to our Board by AEA. Senator Gregg, a retired United States Senator and state governor, has spent over three decades in public office, most recently serving as the U.S. Senator from the State of New Hampshire from January 1993 until January 2011. During his tenure in the Senate, Senator Gregg served on key Senate committees, including Budget, Appropriations, Government Affairs, Banking, Housing and Urban Affairs, Commerce, Science and Transportation, Foreign Relations and Health, Education, Labor and Pensions. He was the Chairman and Ranking Member of the Health, Education, Labor and Pensions Committee and the Chairman and Ranking Member of the Senate Budget Committee, as well as chairman of various sub-committees. Senator Gregg was a chief negotiator of the Emergency Economic Stabilization Act of 2008; the lead sponsor of the Deficit Reduction Act of 2005; and, with the late Senator Ted Kennedy, co-authored the No Child Left Behind Act of 2001. In March 2010, Senator Gregg was appointed to President Obama's bipartisan National Commission on Fiscal Responsibility and Reform. Before joining the U.S. Senate, Senator Gregg was Governor of New Hampshire from 1989 to 1993 and a U.S. Representative from 1981 to 1989. Senator Gregg was named as Dartmouth College's first distinguished fellow and teaches at the college and its graduate schools. Senator Gregg serves on the board of directors and audit committee of Honeywell International Inc. (NYSE: HON) and was a member of the board of directors of Intercontinental Exchange, Inc. (NYSE: ICE) from 2011 to 2013.

Senator Gregg received an A.B. from Columbia University and a J.D. and an L.L.M. from Boston University.

33.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Gregg made the following sales of Company stock (and made no purchases of Company stock). On March 19, 2018, Defendant Gregg sold 24,531 shares at a price of $21.29 for a total value of $522,264. On March 21, Defendant Gregg sold 3,680 shares at a price of $21.29 for a total value of $78,347. Thus, in total, before the fraud was exposed, he sold 28,211 Company shares on inside information, for which he received approximately $600,611.

34.     Defendant Gregg has received and continues to receive lavish compensation for his roles within the Company. During fiscal year 2018, Gregg received $158,244 in total compensation. Defendant Gregg also holds 3,968 restricted stock units, which fully vested on February 28, 2019.

**Defendant Bhambri**

35.     Defendant Bhambri has served on the Company's Board of Directors since March 2014.

36.     The Company's Schedule 14A Proxy Statement states the following about Defendant Bhambri:

> Harbhajan (Nick) Bhambri has served on our Board since March 2014 and was initially recommended to our Board by AEA. A retired chemicals/manufacturing executive, Mr. Bhambri has been President of Louis York Capital, a private investment firm focusing on the industrial, chemical, energy, manufacturing, distribution and services markets, since 2015. Mr. Bhambri spent over two decades of his career at MECS Inc., a Monsanto subsidiary and process technology provider to the sulfuric acid industry serving the refining, metallurgical, uranium and fertilizer industries, including as its President and Chief Executive Officer from 2007 until its acquisition by DuPont in 2012. After retiring from MECS Inc., Mr. Bhambri served as a director of MPG Performance Group (NYSE: MPG) until its acquisition by American Axle & Manufacturing Inc. in 2017. Mr. Bhambri also is

a past president of the Washington University Olin Business School Executive
MBA alumni board and member of the Olin National Council at Washington
University in St. Louis. Mr. Bhambri received a B.S. in Mechanical Engineering
and an M.B.A., both from Washington University in St. Louis.

37.     Defendant Bhambri has received and continues to receive lavish compensation for

his roles within the Company. During fiscal year 2018, Bhambri received $164,994 in total

compensation. Defendant Bhambri also holds 179,807 options, which are fully vested, and holds

3,968 restricted stock units, which fully vested on February 28, 2019.

**Defendant Cappeline**

38.     Defendant Cappeline has served on the Company's Board of Directors since

January 2014.

39.     The Company's Schedule 14A Proxy Statement states the following about

Defendant Cappeline:

Gary A. Cappeline has served on our Board since the inception of our Company's
operations in January 2014. Mr. Cappeline, a retired manufacturing/chemicals
industry executive and merchant/investment banking principal, was an Operating
Partner of AEA from 2007 until December 2018, where he advised on acquisition
opportunities and operational matters at portfolio companies. Prior to joining AEA,
Mr. Cappeline was a President and Chief Operating Officer of Ashland Inc. (NYSE:
ASH), a manufacturer of specialty chemicals, Valvoline motor oil and water
treatment solutions, and a diversified plastics and chemicals distributor with a
division specializing in water treatment solutions, to which he returned in 2002
after service as Group VP of Engelhard Corporation from 1997 to 1999 and as
President, Chemicals of Honeywell International (NYSE: HON) from 1998 to
2000. He also served as chemical industry partner at Bear Stearns Merchant Bank
from 2000 to 2001. Mr. Cappeline currently serves on the board of directors and
nominating and corporate governance committee (as chairman) and compensation
committee of Innophos Holdings, Inc. (Nasdaq: IPHS), an international producer
of specialty ingredient solutions that deliver versatile benefits for the food, health,
nutrition and industrial markets, and on the board of directors and audit committee
of Swanson Industries, Inc., a provider of hydraulic cylinder manufacturing,
remanufacturing and repair services for the mining and mobile industries. He
previously served as a board and executive committee member of the American
Chemistry Council, a chemical industry trade association, a director of Unifrax
Corporation, a manufacturer of high temperature insulation products, chairman and
a director of Houghton International Inc., a manufacturer of metal working fluids,

a director of Shoes for Crews, LLC, a manufacturer of slip resistant footwear, a director of RelaDyne Inc., a distributor of lubricants and fuels, and a director of Tampico Beverages Inc., a manufacturer of fruit drinks. Mr. Cappeline received B.S. and M.S. degrees in Chemical Engineering from the City College of New York and attended Harvard Business School's Executive Management Program in 1993.

**Defendant Hoesterey**

40.    Defendant Hoesterey has served on the Company's Board of Directors since January 2014.

41.    The Company's Schedule 14A Proxy Statement states the following about Defendant Hoesterey:

> Brian R. Hoesterey has served on our Board since the inception of our Company's operations in January 2014. Mr. Hoesterey is President of AEA, which he joined in 1999, where he focuses on investments in the specialty chemicals and value-added industrial products sectors. Prior to joining AEA, Mr. Hoesterey was with BT Capital Partners, the private equity investment vehicle of Bankers Trust from 1998 to 1999. Mr. Hoesterey has also previously worked for McKinsey & Co. from 1994 to 1997 and the investment banking division of Morgan Stanley from 1989 to 1993. Mr. Hoesterey is currently a director of GMS, Inc. (NYSE: GMS), Swanson Industries, Inc., VC GB Holdings, Excelitas Technologies Corp. and Springs Window Fashions. He also serves on the board of trustees for Madison Square Boys and Girls Club and on the board of directors of the Grammy Museum Foundation. Mr. Hoesterey previously served on the boards of directors of At Home Group Inc. (NYSE: HOME), CPG International Inc., Houghton International Inc., SRS, Henry Company, Unifrax Corporation, Pregis Holding II Corporation and Noveon. Mr. Hoesterey currently serves on the Oversight Committee for Patagonia Sur, a for-profit venture that invests in, protects and enhances scenically remarkable and ecologically valuable properties in Chilean Patagonia. Mr. Hoesterey received a B.B.A. in Accounting, summa cum laude, from Texas Christian University and received an M.B.A. with honors from Harvard Business School.

**Defendant Kumar**

42.    Defendant Kumar has served on the Company's Board of Directors since January 2014.

43.    The Company's Schedule 14A Proxy Statement states the following about Defendant Kumar:

Vinay Kumar has served on our Board since the inception of our Company's operations in January 2014. He is a Partner with AEA, which he joined in 2004, where he has focused on investments in the value-added industrial, specialty chemical and business services sectors. Mr. Kumar is currently a director of Excelitas Technologies Corp. Mr. Kumar was previously on the board of Dematic and involved in AEA's investments in CPG International Inc., Cogent Healthcare and Pregis Holdings II Corporation. Prior to joining AEA, Mr. Kumar was a strategy consultant with Bain & Company in San Francisco and London from 2001 to 2004. Mr. Kumar received an A.B. in History and Science with honors from Harvard University.

**Defendant Wilver**

44.     Defendant Wilver has served on the Company's Board of Directors since January 2018.

45.     The Company's Schedule 14A Proxy Statement states the following about Defendant Wilver:

Peter M. Wilver joined our Board in January 2018. Mr. Wilver, a retired technology manufacturing and services executive and certified public accountant, joined Thermo Electron Corp. in 2000 and was appointed as its Chief Financial Officer in 2004. Following the creation of Thermo Fisher Scientific Inc., a leading provider of laboratory products and services (NYSE: TMO) ("Thermo Fisher"), in 2006 through the merger of Thermo Electron Corp. and Fisher Scientific International Inc., Mr. Wilver continued as Chief Financial Officer from 2006 to 2015 and as Executive Vice President and Chief Administrative Officer from 2015 until retirement in March 2017. Before joining Thermo Fisher, Mr. Wilver worked for General Electric, Grimes Aerospace Company and Honeywell International (formerly AlliedSignal), where he most recently served as Vice President and Chief Financial Officer of the electronic materials business. Mr. Wilver currently serves on the board of directors and audit and compensation committees of CIRCOR International, Inc. (NYSE: CIR). Mr. Wilver previously served on the board of directors and audit and human resources committees of Tenet Healthcare Corporation (NYSE: THC). Mr. Wilver received a B.S.B.A. in Accounting from The Ohio State University.

46.     Defendant Wilver has received and continues to receive lavish compensation for his role within the Company. During fiscal year 2018, Wilver received $170,494 in total compensation. Defendant Wilver also holds 3,968 restricted stock units, which fully vested on February 28, 2019.

47.   The Defendants named in ¶¶ 19-46 are sometimes referred to herein collectively as the "Individual Defendants."

48.   The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

49.   About the Individual Defendants' role within and importance to the Company and its future, the Company said the following:

> Experienced management team with proven operational capabilities that has made Evoqua an employer of choice. We are highly dependent on our leadership team, which consists of industry veterans with a track record of executing effective strategies and achieving profitable growth.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

50.   By reason of their positions as officers, directors, and/or fiduciaries of Evoqua and because of their ability to control the business and corporate affairs of Evoqua, the Individual Defendants owed Evoqua and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Evoqua in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to

act in furtherance of the best interests of Evoqua and its shareholders so as to benefit all shareholders equally.

51.    Each director and officer of the Company owes to Evoqua and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

52.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Evoqua, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

53.    To discharge their duties, the officers and directors of Evoqua were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Evoqua, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

55.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance,

growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

56.    To discharge their duties, the officers and directors of Evoqua were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Evoqua were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Pennsylvania, and the United States, and pursuant to Evoqua's own Code of Business Conduct and Ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Evoqua conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Evoqua and procedures for the reporting of the business and internal

affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Evoqua's operations would comply with all applicable laws and Evoqua's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

57.    Each of the Individual Defendants further owed to Evoqua and the shareholders the duty of loyalty requiring that each favor Evoqua's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

58.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Evoqua and were at all times acting within the course and scope of such agency.

59.     Because of their advisory, executive, managerial, and directorial positions with Evoqua, each of the Individual Defendants had access to adverse, non-public information about the Company.

60.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Evoqua.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

61.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

62.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

63.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

64.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

65.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Evoqua, and was at all times acting within the course and scope of such agency.

## EVOQUA'S CODE OF CONDUCT

66.     Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Conduct"), the Company adopted its Code of Conduct to "guide everything we do and reinforce our unwavering commitment to customer service."

67.     The Code of Conduct provides, as to compliance with the Code and with laws, rules and regulations, that:

> We all have a duty to fully read and understand this Code. Each one of us is responsible for doing the right thing, and protecting the integrity of our colleagues and the Company. We must avoid even the appearance of impropriety at all times. If something does not feel right, it probably isn't right. Ask before acting. If you become aware of a situation that may violate this Code, applicable law, or any other Company policy, you have a duty to your colleagues and the Company to report it as soon as possible. Avenues for you to report your concerns are detailed in the "Feedback and Reporting" section of the Code. Failure to comply with this Code or any other applicable law or policy may have severe consequences for you, your co-workers and the Company itself. Non-compliance can damage the Company's reputation and your reputation as well. In some cases, noncompliance may subject those involved to criminal prosecution and lawsuits. The Company will enforce this Code and all other Company policies. Non-compliance may lead to disciplinary action up to and including termination. The Company may also report applicable instances of non-compliance to government authorities.

68.     The Code of Conduct provides, as to "Responsibility to Our Investors," that:

Open and effective communication requires accurate and truthful reporting. This applies equally to relationships with investors, employees, customers and business partners, as well as with the public and all governmental offices. We must ensure that all financial records we create and submit, including time cards, expense reports, project cost estimates, purchase orders, invoices, payroll records and inventory records are complete, accurate, timely and free from misleading statements. All transactions affecting the Company, directly or indirectly, must be recorded properly, accurately and timely and be documented in the Company's books and records in accordance with the Company's policies and procedures, U.S. Generally Accepted Accounting Principles and the rules and regulations of the federal and state securities laws. Misrepresentation of any nature may lead to civil or criminal liability for you and the Company. Misrepresentations may take the form of omissions and inaccuracies, as well as organizing information in a way that is intended to mislead or misinform the recipient. We must never authorize or condone the use of any "off-book" accounting, side letters containing terms that are inconsistent with a contract, unrecorded bank accounts, "slush funds," or any other device that could be utilized to distort records or reports of the Company's true operating results and financial condition.

69.     The Code of Conduct provides, as to "Communicating with the Public," that:

The Company is committed to providing fair disclosure of information about the Company and complying with the legal and regulatory requirements related to the disclosure of material Company information. It is the Company's policy to maintain an active and open public dialogue with its shareholders and potential investors. In general, only the Company's spokespersons are authorized to speak with the investment community and the media. Other than the Company's spokesperson, no employee, director or officer should discuss material non-public information outside of the Company. Employees, officers and directors should still communicate with customers, suppliers and other business partners during the normal course of business. If you believe you may need to disclose material, non-public or sensitive information you should contact the Legal department to determine if a non-disclosure agreement is needed. All requests for information from securities analysts, stockholders, media or the general public should be referred to one of the official Company spokespersons. Without the express approval of the CEO or one of the designated company spokespersons, you are not authorized to speak on behalf of the Company or to respond to specific inquiries from the investment community or the media.

70.     The Code of Conduct provides, as to reporting and compliance procedures, that:

If you observe or suspect any such activity, you must report it to the Compliance Helpline, the Ethics & Compliance Department or any other reporting outlet mentioned in this Code. You should feel free to report any suspected violation of this Code or other law or policy without fear of your employment being adversely

affected. The Company strictly prohibits acts of retaliation against any person for reporting a possible violation in good faith.
.

71.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including violations of Section 10(b) and 20(a) of the Exchange Act.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

72.     Evoqua delivers products, solutions, and services related to water quality and consistency for industrial users, recreational facilities, and municipalities. The Company purports to be a leading provider of water treatment solutions and maintains over 200,000 installations worldwide. The Company prides itself for its extensive service and support network, which allows easy access to over 90% of the Company's customers' sites.

73.     On October 10, 2017, the Company filed its registration statement with the SEC on a Form S-1 (the "IPO Registration Statement") as part of its initial public offering (the "IPO"). The Company's IPO Registration Statement was declared effective by the SEC on November 1, 2017, and the Company filed a final prospectus on November 3, 2017 (the "IPO Prospectus").

74.     The Company completed its IPO on November 6, 2017 of 27.8 million shares of common stock at a price of $18.00 per share.

75.     On October 30, 2018, the Company announced lower than expected preliminary financial results for its fourth quarter and fiscal year ended September 30, 2018. The preliminary financial results fell below both the Company's and analyst's expectations.  According to Evoqua,

the underperformances were "primarily due to acquisition system integration issues, supply chain disruptions influenced by tariffs and an extended delay on a large aquatics project."

76.     On this news, Evoqua's stock price fell $4.78 per share, or 34%, from closing at $13.80 on October 29, 2018, to close at $9.02 on October 30, 2018.

77.     Throughout the Relevant Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and misleading statements that failed to disclose, *inter alia*, that the Company: (1) was experiencing disruptions in its supply chain due in part to a prolonged delay in a substantial aquatics project and tariffs; (2) was unable to effectively assimilate its prior acquisitions; and (3) failed to maintain internal controls. As a result of the foregoing, Evoqua's public statements and projections were materially false and misleading at all relevant times.

78.     As a result of Defendants' false and/or misleading statements, Evoqua securities traded at inflated prices. However, after disclosure of Defendants' false and/or misleading statements, Evoqua's stock suffered a precipitous decline in market value.

**False and Misleading Statements**

79.     On November 6, 2017, the Company completed its IPO. In the Company's IPO Prospectus, Evoqua touted its experienced management team, stating in relevant part:

> Experienced management team with proven operational capabilities that has made Evoqua an employer of choice. We are highly dependent on our leadership team, which consists of industry veterans with a track record of executing effective strategies and achieving profitable growth. Ron Keating, our CEO, is a highly experienced executive with a strategic, commercial and operational background developed in senior roles, where he reshaped organizations and corporate portfolios for growth. Ben Stas, our CFO, has held a variety of senior financial and business roles in the capital goods sector. Our leadership developed and deployed standard operating processes under the Evoqua Growth System that repositioned the business and improved margins through operational programs and standards such as LEAN operating systems, service growth and ePro, among others. These programs, combined with our newly implemented sales methodology, Evoqua

EDGE, have improved our free cash flow profile and growth prospects. Our management team has also expanded our operations to new target markets and geographies and has demonstrated successful acquisition and integration capabilities. Our success depends to a significant extent on our ability to retain or attract employees in senior management, skilled technical, engineering, sales and other key personnel.

After the AEA Acquisition, we began a transformation of our business into a global organization with an independent, professional management team. We believe our transformation has made us into a premier partner and employer in our industry, resulting in differentiated capabilities and talent within our organization. We have instilled an entrepreneurial environment where employees believe in the mission and leverage the collective intellect and expertise of service technicians and engineers. To develop a safety focused culture, we have invested heavily in our environmental, health and safety ("EH&S") program, which is committed to providing employees with a safe and healthy workplace while protecting our shared environment.

80.     The IPO Prospectus additionally promoted the Company's growth potential, operational improvements, and initiatives, stating specifically that:

Well invested manufacturing and service footprint provides operating leverage and supports our growth. We believe our manufacturing, service and sales functions are capable of supporting our long-term growth targets. Our manufacturing base is currently operating at approximately 40% of its maximum capacity levels at June 30, 2017, creating an opportunity for volume and margin expansion without significant new capital investments. This dynamic also enhances our ability to absorb new acquisitions into our existing operations, though we may not be able to successfully identify, integrate or compete for acquisition targets. We have also identified and are pursuing several operational improvement campaigns including ePro and LEAN, our supply chain excellence initiative that centralizes and standardizes purchasing across the organization. These initiatives, combined with low levels of maintenance capital expenditures and efficient working capital management, create flexibility to deploy cash flow for accretive investments.

81.     On December 4, 2017, Evoqua filed its annual report on a Form 10-K with the SEC for the fiscal year ended and quarter ended September 30, 2017 (the "2017 10-K"), which was signed by all the Individual Defendants. The 2017 10-K outlined the Company's operating and financial results and credited the Company's supposed "accretive tuck-in acquisitions" as a key factor in its "Growth [S]trategy."

82.     Attached to the 2017 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by the Individual Defendants attesting to the accuracy of the 2017 10-K.

83.     On March 12, 2018, the Company filed another registration statement on Form S-1 with the SEC as part of a new offering of common stock (the "Registration Statement"), which was signed by the Individual Defendants. The Registration Statement also included a preliminary prospectus (the "Prospectus").  Like the IPO Prospectus, the Prospectus maintained that one of Evoqua's strengths was its "[e]xperienced management team" which had "proven operational capabilities." It additionally promoted the Company's operations, growth potentials, and initiatives, and again pointed to supposed "accretive tuck-in acquisitions" which the Company touted was a key factor in its growth strategy. Specifically, the Prospectus stated in relevant part that:

> As a complement to our organic growth initiatives, we view tuck-in acquisitions as a key element of our overall growth strategy which will enable us to accelerate our growth in our current addressable market, new geographies and new end market verticals. Our existing customer relationships, channels to market and ability to rapidly commercialize technologies provide a strong platform to drive growth in the businesses we acquire. To capitalize on these opportunities we have built an experienced team dedicated to mergers and acquisitions that has successfully completed ten technology-enhancing and geography-expanding acquisitions since April 2016, including the addition of capabilities in the attractive aquatics market, which we have typically financed through borrowings under our revolving credit facility and cash on hand. Although we may not continue to identify suitable acquisition targets and implement our growth strategy, we currently have a pipeline which includes more than 60 potential targets, which has been developed proactively by our team as well as informed by our customer base.

84.     The statements in ¶¶ 79-83 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that the Company: (1) was experiencing disruptions in its supply chain due in part to a prolonged delay in a substantial

aquatics project and tariffs; (2) was unable to effectively assimilate its prior acquisitions; and (3) failed to maintain internal controls. As a result of the foregoing, Evoqua's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

85.     On October 30, 2018, the Company issued a press release filed with the SEC on a Form 8-K announcing its preliminary fourth quarter and full year results for the fiscal year ended September 30, 2018. The press release revealed that the preliminary results were below the Company's previous expectations and that Evoqua was "disappointed with [its] full-year performance." The press release stated in relevant part:

> Evoqua now expects its full-year 2018 revenues to be between $1.33 billion to $1.34 billion, an increase of approximately 7% to 7.4% over 2017 versus a prior expectation range of $1.34 billion to $1.37 billion, which would have represented an increase of 7% to 10% over the previous year. The Company also expects full-year 2018 adjusted earnings before interest, taxes, depreciation and amortization ("Adjusted EBITDA") to be in the range of $213 million to $217 million, an increase of 2.6% to 4.5% over the previous year. The prior Adjusted EBITDA expectation range was $235 million to $245 million, which would have represented an increase of 13% to 18% over 2017. The full-year expectation implies fourth quarter revenues to be in the range of $358 million to $368 million and Adjusted EBITDA to be in the range of $58 million to $62 million.

86.     The press release outlined that the Company experienced challenges in its Product seqment's aquatics business and Municipal segment and attributed the "combined shortfalls" to "to acquisition system integration issues, supply chain disruptions influenced by tariffs and an extended delay on a large aquatics project." After stating the Company's disappointing results, the press release stated, "the majority of [Evoqua's] businesses are performing in-line with expectations." The press release also  included an adjustment to the Company's operating model, outlining a "transition from a three-segment structure to a two-segment operating model designed to better serve the needs of customers worldwide." The new operating model made clear that the

Company's previous representations regarding the strength of its customer service and operational capabilities as driving forces behind the Company's profitability were mistaken. Specifically, Defendant Keating described the two-segment model in the press release, stating in relevant part:

> This two-segment restructuring allows divisions with similar business models to be aligned and in some instances combined. By aligning complementary go-to-market strategies, we expect to improve technology deployment and provide more comprehensive customer solutions while lowering our cost structure. Restructuring charges of $17 million to $22 million are expected to be incurred through the implementation of the two-segment structure and related footprint rationalization over the next two fiscal years. The cost savings associated with our actions should begin in Q3 2019, with anticipated benefits in the range of $15 million to $20 million on an annualized basis once fully implemented. We remain committed to the industrial, municipal and aquatics markets and believe that this new structure will position us for improved long-term growth and profitability.

87.     On this news, Evoqua's stock price fell $4.78 per share, or 34%, from closing at $13.80 on October 29, 2018 to close at $9.02 on October 30, 2018.

## Repurchases During the Relevant Period

88.     During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company.

89.     According to the Company's Form 10-K filed with the SEC on December 11, 2018, the Company spent an aggregate amount of $250,000 to repurchase 18,000 shares of its own common stock from October 30, 2017 through September 30, 2018.

90.     As the Company stock was actually only worth $9.02 per share, the price at closing on October 30, 2018, the Company overpaid approximately $67,640 in total for these repurchases.

## DAMAGES TO EVOQUA

91.     As a direct and proximate result of the Individual Defendants' conduct, Evoqua will lose and expend many millions of dollars.

92.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

93.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

94.     As a direct and proximate result of the Individual Defendants' conduct, Evoqua has also suffered and will continue to suffer higher financing costs, a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

95.     Plaintiff brings this action derivatively and for the benefit of Evoqua to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Evoqua, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

96.     Evoqua is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

97.     Plaintiff is, and has been at all relevant times, a shareholder of Evoqua.  Plaintiff will adequately and fairly represent the interests of Evoqua in enforcing and prosecuting its rights,

and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

98.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

99.     A pre-suit demand on the Board of Evoqua is futile and, therefore, excused.  At the time of filing of this action, the Board consists of Defendants Keating, Lamb, Gregg, Bhambri, Cappeline, Hoesterey, Kumar, and Wilver (collectively, the "Director-Defendants") and non-party Lynn Swann (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

100.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while three of the Director-Defendants engaged in insider sales based on non-public information, netting proceeds of over $10 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

101.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  While investors were duped into believing the fraud perpetrated by the Individual Defendants through their false and misleading

statements and omissions, the Individual Defendants caused the Company to repurchase its own stock and four of the Individual Defendants collectively sold over $12.1 million worth of Company stock at artificially inflated prices based on material inside information.  As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

102.    Additional reasons that demand on Defendant Keating is futile follow.  Defendant Keating currently serves as the Company's CEO, and is thus, as the Company admits, a non-independent director.  He has received and continues to receive lavish compensation, most recently receiving $12,283,463 in compensation during the 2018 fiscal year.  Defendant Keating was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings, press releases, and conferences calls referenced herein, almost all of which he personally made statements in or signed.  As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  His insider sales before the fraud was exposed, which yielded at least $7.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Keating is a defendant in the Securities Class Action.  For these reasons, Defendant Keating breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

103.    Additional reasons that demand on Defendant Lamb is futile follow.  Defendant Lamb currently serves as the Chairperson of Evoqua's Board of Directors.  Defendant Lamb has

received and continues to receive lavish compensation for his roles within the Company. During fiscal year 2018, Lamb received $206,119 in total compensation. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded at least $2.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, Defendant Lamb breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

104.    Additional reasons that demand on Defendant Gregg is futile follow. Defendant Gregg currently serves as a Director for Evoqua. Defendant Gregg has received and continues to receive lavish compensation for his roles within the Company. During fiscal year 2018, Gregg received $158,244 in total compensation. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded at least $600,611 in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, Defendant Gregg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

105.    Additional reasons that demand on Defendant Bhambri is futile follow. Defendant Bhambri currently serves as a Director for Evoqua. Defendant Bhambri has received and continues to receive lavish compensation for his roles within the Company. During fiscal year 2018, Bhambri

received $164,994 in total compensation. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Bhambri breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

106.   Additional reasons that demand on Defendant Cappeline is futile follow. Defendant Cappeline currently serves as a Director for Evoqua. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Cappeline breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

107.   Additional reasons that demand on Defendant Hoesterey is futile follow. Defendant Hoesterey currently serves as a Director for Evoqua. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Hoesterey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

108.    Additional reasons that demand on Defendant Kumar is futile follow.  Defendant Kumar currently serves as a Director for Evoqua.  As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  For these reasons, Defendant Kumar breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

109.    Additional reasons that demand on Defendant Wilver is futile follow.  Defendant Wilver currently serves as a Director for Evoqua.  As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  For these reasons, Defendant Wilver breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

110.    Additional reasons that demand on the Board is futile follow.

111.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

112.     In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 10(b) and 20(a) of the Exchange Act.  In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest and unlawful insider trading, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

113.     Evoqua has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Evoqua any part of the damages Evoqua suffered and will continue to suffer thereby.  Thus, any demand upon the Director-Defendants would be futile.

114.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of

exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

115.    The acts complained of herein constitute violations of fiduciary duties owed by Evoqua's officers and directors, and these acts are incapable of ratification.

116.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Evoqua.  If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Director-Defendants were to sue themselves or certain of the officers of Evoqua, there would be no directors' and officers' insurance protection.  Accordingly, the Director-Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director-Defendants is futile and, therefore, excused.

117.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Evoqua to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

118.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 10(b) of the Securities Exchange Act of 1934

119.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

120.    Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, provides, in relevant part, that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

121.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Evoqua. Not only is Evoqua now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Evoqua by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase approximately its own securities at artificially-inflated prices, damaging Evoqua.

122.    The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's public statements.

123.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Evoqua not misleading.

124.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Evoqua.

125.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

126.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

127.    Plaintiff on behalf of Evoqua has no adequate remedy at law.

### SECOND CLAIM

**Against Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

128.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

129.    Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, provides, in relevant part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation of cause of action."

130.    The Individual Defendants, by virtue of their positions with Evoqua and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Evoqua and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Evoqua to engage in the illegal conduct and practices complained of herein.

131.    Plaintiff on behalf of Evoqua has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

132.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

133.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Evoqua's business and affairs.

134.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

135.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Evoqua.

136.     In breach of their fiduciary duties owed to Evoqua, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that the Company was: (1) experiencing disruptions in its supply chain due in part to a prolonged delay in a substantial aquatics project and tariffs; (2) was unable to effectively assimilate its prior acquisitions; and (3) failed to maintain internal controls.

137.     The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

138.     Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

139.    Additionally, four of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact referenced herein.

140.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Evoqua's securities and disguising insider sales.

141.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Evoqua's securities and engaging in insider sales.

142.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

143.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Evoqua has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

144.    Plaintiff on behalf of Evoqua has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

145.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

146.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Evoqua.

147.    The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Evoqua that was tied to the performance or artificially inflated valuation of Evoqua, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

148.    Plaintiff, as a shareholder and a representative of Evoqua, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

149.    Plaintiff on behalf of Evoqua has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Abuse of Control

150.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Evoqua, for which they are legally responsible.

152.    As a direct and proximate result of the Individual Defendants' abuse of control, Evoqua has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Evoqua has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

153.    Plaintiff on behalf of Evoqua has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Gross Mismanagement

154.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

155.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Evoqua in a manner consistent with the operations of a publicly-held corporation.

156.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Evoqua has sustained and will continue to sustain significant damages.

157.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

158.    Plaintiff on behalf of Evoqua has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

159.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

160.    The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

161.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Evoqua to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

162.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

163.    Plaintiff on behalf of Evoqua has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Evoqua, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached their fiduciary duties to Evoqua;

42

(c)      Determining and awarding to Evoqua the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing Evoqua and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Evoqua and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

      2. a provision to permit the shareholders of Evoqua to nominate at least five candidates for election to the board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Evoqua restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

Dated: April, 10, 2019

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

David Dean
Jacob Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: ddean@rosenlegal.com
Email: jgoldberg@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*

## **VERIFICATION**

I, Dallas Torgersen, am a plaintiff in the within action.  I have reviewed the allegations made in this consolidated shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of _____ 4/10/2019, 2019.

Dallas Torgersen