**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE EVOQUA WATER TECHNOLOGIES CORP. DERIVATIVE LITIGATION | Lead Case No. 2:19-cv-00410-MPK |

**PLAINTIFFS' UNOPPOSED MOTION FOR
PRELIMINARY APPROVAL OF DERIVATIVE SETTLEMENT**

Plaintiffs Dallas Torgersen and Robert Hyams ("Plaintiffs"), derivatively on behalf of Evoqua Water Technologies Corp. ("Evoqua" or the "Company"), hereby move this Court, pursuant to Rule 23.1(c) of the Federal Rules of Civil Procedure, for preliminary approval of the Settlement set forth in the Stipulation and Agreement of Settlement, dated July 28, 2021 ("Stipulation),[1] and respectfully request the Court enter the [Proposed] Order Regarding Notice and Procedures for Proposed Settlement ("Preliminary Approval Order"), which: (a) grants preliminary approval of the Settlement, (b) approves the form and manner of providing notice to Current Evoqua Shareholders, and (c) schedules a date for the Settlement Hearing.

In support of this motion, Plaintiffs rely upon the accompanying Memorandum of Law, the Declaration of Timothy Brown, the Stipulation and exhibits annexed thereto, and all prior pleadings and proceedings.

The Parties' agreed-upon form of proposed Preliminary Approval Order is attached as Exhibit B to the Stipulation. Plaintiffs respectfully request that the Court enter the proposed Preliminary Approval Order and insert a date for the final settlement hearing in paragraph 3. For the Court's convenience, the proposed Preliminary Approval Order is also submitted herewith.

---

[1] Unless otherwise stated, all capitalized terms used herein shall have the same meanings as set forth in the Stipulation, which is attached as Exhibit 1 to the Declaration of Timothy Brown in support of Plaintiffs' Unopposed Motion for Preliminary Approval of Derivative Settlement ("Declaration of Timothy Brown"), which is being submitted concurrently herewith.

Dated: August 3, 2021

**LAW OFFICE OF LEON AUSSPRUNG, MD, LLC**

  _/s/ James E. Hockenberry_
James E. Hockenberry (P.A. I.D. 91133)
1800 John F. Kennedy Boulevard
Suite 1500
Philadelphia, PA  19103
Telephone: (215) 717-0744
JH@aussprunglaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
tbrown@thebrownlawfirm.net

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
pkim@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE EVOQUA WATER TECHNOLOGIES CORP. DERIVATIVE LITIGATION | Lead Case No. 2:19-cv-00410-MPK |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED**
**MOTION FOR PRELIMINARY APPROVAL OF DERIVATIVE SETTLEMENT**
**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................ 2

II.   BACKGROUND OF THE CONSOLIDATED ACTION AND SETTLEMENT
      NEGOTIATIONS ............................................................................................... 3

      A.    Factual Background ................................................................................ 3

      B.    Procedural History ................................................................................. 5

      C.    Settlement Negotiations ......................................................................... 8

III.  TERMS OF THE SETTLEMENT ..................................................................... 9

IV.   THE SETTLEMENT MERITS PRELIMINARY APPROVAL ....................... 12

      A.    Applicable Legal Standards ................................................................... 12

      B.    The Settlement Is Within the Range of Possible Final Approval ......... 14

            1.    The Settlement Is the Product of Arm's Length Negotiations and Is
                  Therefore Presumptively Fair and Reasonable ......................... 14

            2.    The Settlement Confers Substantial and Material Benefits on Evoqua .... 17

            3.    The Settlement Appropriately Balances the Significant Risks of
                  Continued Litigation with the Benefits Conferred Upon Evoqua and
                  Its Stockholders ........................................................................ 18

V.    THE NOTICE PROCEDURES OUTLINED IN THE STIPULATION ARE
      REASONABLE ................................................................................................. 20

VI.   PROPOSED SCHEDULE ................................................................................. 22

VII.  CONCLUSION .................................................................................................. 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Apollo Grp., Inc. Sec. Litig.*,
  No. CV 04-2147, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008),
  *rev'd and remanded*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) ................. 19

*In re Auto. Refinishing Paint Antitrust Litig.*,
  MDL No. 1426, 2004 WL 1068807 (E.D. Pa. May 11, 2004) ................................................. 14

*Battaline v. Advest, Inc.*,
  No. 06-569, 2008 WL 11510309 (W.D. Pa. Mar. 20, 2008) ................................................... 13

*Bell Atl. Corp. v. Bolger*,
  2 F.3d 1304 (3d Cir. 1993)........................................................................................................ 18

*Bradburn Parent Teacher Store, Inc. v. 3M*,
  513 F. Supp. 2d 322 (E.D. Pa. 2007) ...................................................................................... 20

*Bushansky v. Armacost*,
  No. 12-cv-01597-JST, 2014 WL 2905143 (N.D. Cal. June 25, 2014) .................................... 21

*In re Chambers Dev. Sec. Litig.*,
  912 F. Supp. 852 (W.D. Pa. 1995) ............................................................................................ 16

*In re Chickie's & Pete's Wage & Hour Litig.*,
  No. 12-6820, 2014 WL 911718 (E.D. Pa. Mar. 7, 2014) ........................................................ 16

*Cohn v. Nelson*,
  375 F. Supp. 2d 844 (E.D. Mo. 2005)....................................................................................... 12

*Eichenholtz v. Brennan*,
  52 F.3d 478 (3d Cir. 1995)...........................................................................................................  2

*Gates v. Rohm & Haas Co.*,
  248 F.R.D. 434 (E.D. Pa. 2008) ................................................................................................ 13

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995).......................................................................................................... 20

*Girsh v. Jepson*,
  521 F.2d 153 (3d Cir. 1975)................................................................................................. 13, 14

*Haas v. Pittsburgh Nat'l Bank*,
  495 F. Supp. 815 (W.D. Pa. 1980)............................................................................................. 15

*In re Intel Corp. Derivative Litig.*,
No. CIV.A. 09-867-JJF, 2010 WL 2955178 (D. Del. July 22, 2010)................................ 13, 14

*Singleton v. First Student Mgmt. LLC*,
No. CIV.A. 13-1744 JEI, 2014 WL 3865853 (D.N.J. Aug. 6, 2014) ...................................... 13

*Jackson v. Wells Fargo Bank, N.A.*,
No. 2:12-cv-01262-DSC, 2014 WL 12600178 (W.D. Pa. Oct. 27, 2014)................................ 15

*Maher v. Zapata Corp.*,
714 F.2d 436 (5th Cir. 1983) ............................................................................................... 19, 20

*Mehling v. New York Life Ins. Co.*,
No. 99-5417, 2007 WL 3145344 (E.D. Pa. Oct. 24, 2007) ................................................ 13, 15

*Mills v. Elec. Auto-Lite Co.*,
396 U.S. 375 (1970)................................................................................................................... 18

*In re Metro. Life Ins. Co. Sales Practices Litig.*,
1999 WL 33957871 (W.D. Pa. Dec. 28, 1999)......................................................................... 15

*In re NVIDIA Corp. Derivative Litig.*,
No. 06-06110, 2008 WL 5382544 (N.D. Cal. Dec. 22, 2008).................................................. 12

*In re Rambus Inc. Derivative Litig.*,
No 06-3513, 2009 WL 166689 (N.D. Cal. Jan. 20, 2009)........................................................ 21

*In re Rent-Way Secs. Litig.*,
305 F.Supp.2d 491 (W.D. Pa. 2003)......................................................................................... 19

*Shlensky v. Dorsey*,
574 F.2d 131 (3d Cir. 1978)...................................................................................................... 17

*In re Sch. Asbestos Litig.*,
921 F.2d 1330 (3d Cir. 1990).................................................................................................... 20

*Unite Nat'l Ret. Fund v. Watts*,
No. Civ.A. 04CV3603DMC, 2005 WL 2877899 (D.N.J. Oct. 28, 2005) .......................... 12, 17

*Vinh Du v. Blackford*,
No. 17-cv-194, 2018 U.S. Dist. LEXIS 167103 (D. Del. Sept. 28, 2018)................................ 13

*Yang v. Focus Media Holding Ltd.*,
No. 11 Civ. 9051 (CM) (GWG), 2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014)................... 15, 16

**Other Authorities**

7 Alba Conte & Herbert Newberg,
Newberg on Class Actions § 22.110 (4th ed. 2002) .................................................................. 13

7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
 Federal Practice and Procedure: Civil 3D § 1839 (2007) ........................................................ 13

*Manual for Complex Litigation* (Fourth) (2004) ........................................................................ 13

**Rules**

Fed. R. Civ. P. 23.1(c) ......................................................................................................... 1, 12

Pursuant to Fed. R. Civ. P. 23.1(c) of the Federal Rules of Civil Procedure, plaintiffs Dallas Torgersen ("Torgersen") and Robert Hyams ("Hyams," and collectively with Torgersen, "Plaintiffs") respectfully submit this Memorandum of Law in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Derivative Settlement of this consolidated derivative action (the "Consolidated Action" or the "Derivative Action").[1] The terms of the Settlement[2] are set forth in the Stipulation and Agreement of Settlement dated July 28, 2021 (the "Stipulation"), which is attached as Exhibit 1 to the Declaration of Timothy Brown in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Derivative Settlement. Specifically, Plaintiffs respectfully request that this Court enter the [Proposed] Order Regarding Notice and Procedures for Proposed Settlement ("Preliminary Approval Order"), which provides for, among other things: (i) preliminary approval of the Settlement as set forth in the Stipulation; (ii) approval of the method of providing notice of the Settlement to Current Evoqua Shareholders; (iii) approval of the form of the Notice of Proposed Settlement of Derivative Action, Settlement Hearing, and Right to Appear ("Notice"), substantially in the form attached as Exhibit C to the Stipulation; and (iv) setting a date for the Settlement Hearing for the purpose of determining whether the Settlement should be finally approved as fair, reasonable, and adequate.[3]

---

[1] The Settlement also resolves the related litigation demand (the "Demand") on Evoqua's Board made by Mike Merkwan ("Merkwan"), as described herein. Plaintiffs, Merkwan and Defendants are collectively referred to as the "Parties."

[2] Unless noted otherwise, all capitalized terms used herein shall have the same meaning as set forth in the Stipulation.

[3] The Parties' agreed-upon form of proposed Preliminary Approval Order is attached as Exhibit B to the Stipulation. For the Court's convenience, the proposed Preliminary Approval Order is also submitted herewith.

## I.      INTRODUCTION

In determining whether preliminary approval of the Parties' proposed Settlement is warranted, the sole issue before the Court is whether the Settlement is within the range of what could be found to be fair, adequate, and reasonable, so that notice can be given to Current Evoqua Shareholders and a Settlement Hearing can be scheduled for the Court to consider final approval of the Settlement.[4] The Settlement is the product of substantial effort, advocacy, and arm's-length negotiations conducted by skilled and experienced counsel for Plaintiffs, shareholder Merkwan, the Individual Defendants, the AEA Defendants, and nominal defendant Evoqua with the assistance of a well-reputed mediator, Greg Danilow, Esq. of Phillips ADR (the "Mediator"). The Settlement guarantees Evoqua the substantial benefits of the corporate governance revised practices provided for in Exhibit A to the Stipulation (the "Revised Practices"), which will improve the Company's internal controls and directly address the alleged deficiencies that Plaintiffs contend resulted in the alleged wrongdoing. In recognition of the benefits conferred on Evoqua and its stockholders as a result of the Revised Practices, the Stipulation further provides that Evoqua and the Individual Defendants will not oppose an application to the Court by Plaintiffs' Counsel for an award of attorneys' fees and expenses in the amount of $610,000 (the "Fees and Expenses Award"), and will cause their insurers to pay the Fees and Expenses Award to the extent approved by the Court. The Parties reached this agreed-to Fees and Expenses Award with the assistance of the Mediator. The Parties have determined that the Settlement is in the best interests of Evoqua and its stockholders, and that the Consolidated Action and the Demand be fully finally resolved in the manner and upon the terms and conditions set forth in the Stipulation.

---

[4] *See Eichenholtz v. Brennan*, 52 F.3d 478, 489 (3d Cir. 1995).

For these reasons, Plaintiffs respectfully request that the Court grant preliminary approval of the Settlement, approve the form and content of the Notice, the means of dissemination of the notice of the Settlement as set forth in the Stipulation, and set a date for a Settlement Hearing.

## II.   BACKGROUND OF THE CONSOLIDATED ACTION AND SETTLEMENT NEGOTIATIONS

### A.   <u>Factual Background</u>

Evoqua purports to be a worldwide leading provider of mission-critical water treatment solutions, offering services, systems, and technologies to support customers' full water lifecycle needs. (*See* Verified Shareholder Derivative Complaint filed in *Hyams v. Keating, et al.*, Case No. 2:20-cv-01122, ¶2.) The Company has over 200,000 installations worldwide and operates in more than 160 locations across ten countries. (*Id.*)

Evoqua was incorporated under the laws of Delaware in 2013 and is headquartered in Pittsburgh, Pennsylvania. (*Id.*, ¶3.) The Company's common stock trades on the New York Stock Exchange under the ticker symbol "AQUA." (*Id.*) In November 2017, through the Company's controlling shareholder, AEA Investors LP ("AEA"), Evoqua went public through an initial public offering ("IPO"). (*Id.*, ¶4.) Evoqua initiated a secondary public offering in March 2018 ("SPO" and, together with the IPO, the "Offerings"). (*Id.*, ¶5.) Through the Offerings, Individual Defendants and the AEA Defendants caused hundreds of millions of dollars of Evoqua common stock to be sold to investors. (*Id.*)

On October 30, 2018, the Company announced disappointing preliminary results for full-year fiscal 2018 and the quarter ending September 30, 2018. (*Id.*, ¶249.) According to the Company, the underperformances were "primarily due to acquisition system integration issues, supply chain disruptions influenced by tariffs and an extended delay on a large aquatics project." (*Id.*, ¶250.) The disappointing preliminary results caused securities analysts to downgrade the

Company, and the Company's share price fell $4.78 per share, or 34.64%, from closing at $13.80 per share on October 29, 2018 to close at $9.02 per share on October 30, 2018. (*Id.*, ¶256.)

Plaintiffs allege that, approximately two years prior to the IPO, Evoqua implemented a Company-wide program to terminate experienced sales personnel as well as managers and administrative personnel with experience integrating new acquisitions into the Company, and replace them with less expensive and less qualified individuals. (*Id.*, ¶109.) Plaintiffs further allege that Evoqua acquired more than a half-dozen companies in the roughly 20-month period leading up to the IPO. (*Id.*, ¶102.) Plaintiffs allege that the company failed to successfully integrate those acquisitions. (*Id.*, ¶108.)

Plaintiffs allege that the Individual Defendants caused Evoqua to artificially enhance its reported revenue, including through accounting manipulations in violation of Generally Accepted Accounting Principles ("GAAP"). (*Id.*, ¶114.) Specifically, Evoqua inappropriately recognized revenue on, *inter alia*, shipments of products that were subject to broad rights of return, products where no final agreement to purchase had been reached, and products that the Company had yet to even manufacture. (*Id.*, ¶¶115-123.) Plaintiffs allege that, instead of disclosing these practices, the Individual Defendants made and/or caused Evoqua to make materially false and misleading statements in press releases, earnings conference calls, and filings with the Securities and Exchange Commission ("SEC") as early as November 1, 2017 and through October 30, by touting the Company's successful integration efforts, the stability of its sales force, and the Company's financial strength and progress. (*Id.*, ¶¶142-207.) Specifically, Plaintiffs, allege that the Individual Defendants made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that the Company: (1) was experiencing disruptions in its supply chain due in part to a prolonged delay in a substantial aquatics project and

tariffs; (2) was unable to effectively assimilate its prior acquisitions and was experiencing significant and expensive problems with its integration attempts; (3) had privately terminated, and was continuing to privately terminate, its most experienced sales and integration personnel; (4) committed GAAP violations, including by improperly recognizing revenue; (5) prioritized short term cost savings by, among other measures, terminating its most experienced sales and integration personnel, foreseeably placing Evoqua's long-term post-IPO and post-SPO prospects at risk; and (6) failing to properly maintain and/or adequately monitor internal controls which would have prevented the foregoing violations of law. Defendants deny these allegations. (*Id.*, ¶321.)

### B.    Procedural History

*Related Securities Class Action*

On November 6, 2018, a putative securities class action was filed in the United States District Court for the Southern District of New York, now captioned *In re Evoqua Water Technologies Corp. Securities Litigation*, No. 1:18-cv-10320, brought on behalf of certain purchasers of Evoqua common stock (the "Securities Class Action").

On April 3, 2019, the lead plaintiffs in the Securities Class Action filed an amended complaint against Evoqua, certain of Evoqua's officers and directors, AEA and certain of its affiliates, and the underwriters of the IPO and the SPO, asserting claims for violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"). (Securities Class Action, D.I. 42) The amended complaint alleged that certain defendants made materially false and misleading statements and omissions about Evoqua's business, including in the offering documents for the IPO and the SPO (the "Offering Materials"), causing the price of Evoqua common stock to be artificially inflated from the date of the IPO through the date of Evoqua's October 30, 2018 announcement of its preliminary financial results for the fourth quarter and full fiscal year 2018. (*Id.*)

On March 30, 2020, the court in the Securities Class Action granted in part and denied in part the defendants' motion to dismiss, thereby triggering the lifting of the Initial Stay. (Securities Class Action, D.I. 87.) Specifically, the court dismissed the Exchange Act claims, but sustained the Securities Act claims arising out of the IPO and the SPO (except as against certain of the officer defendants). (*Id.*)

*This Consolidated Derivative Action*

On April 10, 2019, plaintiff Torgersen filed the first of the two shareholder derivative actions that comprise the Consolidated Action in this Court on behalf of nominal defendant Evoqua, and against the Individual Defendants, captioned *Torgersen v. Keating, et al.*, Case No. 2:19-cv-00410 (the "*Torgersen* Action"). The *Torgersen* Action asserted claims arising from substantially similar facts at issue in the Securities Class Action, and it asserted claims under the Exchange Act as well as claims for alleged breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement and waste of corporate assets. (*Torgersen* Action, D.I. 1.)

On June 14, 2019, the parties to the *Torgersen* Action entered into a stipulation staying the *Torgersen* Action pending the resolution of the defendants' anticipated motion to dismiss in the Securities Class Action (the "Initial Stay"). (*Torgersen* Action, D.I. 9.) The Court entered an order imposing the Initial Stay the same day. (*Torgersen* Action, D.I. 10.)

On July 27, 2020, plaintiff Hyams filed the second of the two shareholder derivative actions that comprise the Consolidated Action in this Court, captioned *Hyams v. Keating, et al.*, Case No. 2:20-cv-01122 (the "*Hyams* Action"). The complaint in the *Hyams* Action alleged substantially similar facts and made substantially similar claims as the complaint filed in the *Torgersen* Action against the Individual Defendants, but added as defendants the AEA Defendants. (*Hyams* Action, D.I. 1.)

On August 18, 2020, the parties to the *Torgersen* Action and the *Hyams* Action filed a joint stipulation requesting that the Court: (a) consolidate the *Torgersen* Action and the *Hyams* Action; (b) designate The Rosen Law Firm, P.A. and The Brown Law Firm, P.C. as co-lead counsel representing Plaintiffs in the Consolidated Action; and (c) stay the Consolidated Action pending the resolution of the anticipated motions for summary judgment to be filed in the Securities Class Action (the "Second Stay"). (*Torgersen* Action, D.I. 14.) Pursuant to the terms of the Second Stay, Plaintiffs were also to be promptly advised of and permitted to participate in any mediation proceedings and formal settlement talks in the Securities Class Action, and to be given copies of the written discovery materials produced by any Defendant in the Securities Class Action. (*Id.*, ¶¶12, 14.) On September 16, 2020, the Court entered an order consolidating the two derivative actions that comprise this Consolidated Action, appointing co-lead counsel for plaintiffs, and imposing the Second Stay. (*Torgersen* Action, D.I. 17.)

<u>Related Litigation Demand</u>

On February 6, 2020, Merkwan made the Demand on Evoqua's Board requesting that the Board investigate and pursue, on behalf of the Company, causes of action for breaches of fiduciary duties against AEA and certain of the Company's officers and directors arising from substantially similar facts at issue in the Consolidated Action. (Stipulation, ¶G.) Thereafter, Merkwan and the Board agreed to hold the Demand in abeyance pending the resolution of the defendants' anticipated motion to dismiss in the Securities Class Action. (*Id.*)

On September 1, 2020, Evoqua, Merkwan, and the Board agreed to continue holding the Demand in abeyance pending the resolution of the anticipated motions for summary judgment to be filed in the Securities Action (the "Second Abeyance Agreement"). (*Id.*, ¶K.)

C.    <u>**Settlement Negotiations**</u>

In late 2020, the parties to the Securities Class Action began discussions about retaining an experienced mediator to see if the parties might be able to resolve that case, and ultimately retained the Mediator. (*Id.*, ¶L.) In accordance with the Second Stay and the Second Abeyance Agreement, Plaintiffs and Merkwan were invited to and did participate in that meditation process. (*Id.*)

On February 27, 2021, Plaintiffs sent Defendants a settlement demand that included a proposal for extensive changes to the Company's corporate governance practices. (*Id.*, ¶M.) On March 12, 2021, Merkwan separately sent Defendants a settlement demand that included a proposal for extensive changes to the Company's corporate governance practices. (*Id.*)

In connection with the mediation process, Plaintiffs, Merkwan, and Evoqua and the Individual Defendants prepared and exchanged comprehensive mediation statements addressing issues relating to liability and damages. (*Id.*, ¶N.)

In advance of the initial mediation session, and in accordance with the Second Stay, Defendants produced to Plaintiffs and Merkwan more than 750,000 documents that they had produced in the Securities Class Action. (*Id.*, ¶O.)

On March 19, 2021, the Parties participated in a full-day mediation session via video-conference, which did not result in the Parties agreeing to a settlement. (*Id.*, ¶P.) Over the seven and a half weeks following the mediation session, Plaintiffs, Merkwan, and the Defendants continued to engage in settlement negotiations, including the exchange of written proposals for certain corporate governance changes that Evoqua might adopt in response to Plaintiffs' and Merkwan's claims. (*Id.*)

Following extensive negotiations, and with the aid of the Mediator, the Parties were ultimately able to reach an agreement in principle to settle the Consolidated Action and the Demand and negotiated and executed a term sheet (the "Term Sheet") on May 10, 2021, which

memorialized the material terms (subject to the Court's approval) of the Parties' settlement. (*Id.*, ¶Q.) In particular, the Term Sheet sets forth, among other things, the Parties' binding agreement to settle all claims asserted on behalf of Evoqua against all Defendants in the Consolidated Action and the Demand in exchange for the Board adopting and implementing the Revised Practices. (*Id.*)

After executing the Term Sheet, Plaintiffs' Counsel and counsel for Defendants separately negotiated, with the aid of the Mediator, the Fees and Expenses Award to be paid to Plaintiffs' Counsel. (*Id.*, ¶15.) In recognition of the benefits conferred on Evoqua and its stockholders as a result of the Revised Practices, Evoqua and the Individual Defendants agreed not to oppose an application to the Court by Plaintiffs' Counsel for an award of attorneys' fees and expenses in the amount of $610,000 (after the Parties accepted a double-blind mediator's proposal for that amount of attorneys' fees and expenses), subject to Court approval. (*Id.*)

As set forth below, the Settlement is fair, reasonable, and adequate, and in the best interests of Evoqua and its shareholders.[5]

## III.     TERMS OF THE SETTLEMENT

As a result of the filing, pendency, and settlement of the Consolidated Action and the Demand, the Board shall adopt resolutions, amend committee Charters, or adopt corporate governance guidelines to implement the Revised Practices, which are set forth in full in Exhibit A to the Stipulation, and which will address the alleged Board- and management-level oversight lapses at issue in the Consolidated Action. Pursuant to the Stipulation, Evoqua will implement the Revised Practices for a minimum of five years following the Effective Date of the Settlement. Key

---

[5] On July 8, 2021, the court in the Securities Class Action preliminarily approved a settlement of all claims in the Securities Class Action and scheduled a settlement hearing for November 1, 2021.

aspects of the Revised Practices, which are fully set forth in Exhibit A to the Stipulation, include, but are not limited to:

**Board Composition and Practices:** The Board shall pass a resolution to, within eighteen months of the approval of the Settlement, replace an existing non-independent director with one new independent director, who shall meet the criteria for director independence set forth in Section 303A.02 of the Listed Company Manual of the New York Stock Exchange.

**Improvements to Risk Management and the Creation of a Risk Committee:** Evoqua shall adopt a resolution and draft a charter formally creating a management-level risk committee (the "Risk Committee"). The Risk Committee shall be primarily responsible for the Company's risk management policies and oversight of the operation of the Company's risk management framework. The Risk Committee shall be responsible for, *inter alia*: (1) monitoring Evoqua's internal risk assessment, including risks reported internally by Evoqua employees; (2) identifying material risks relating to Evoqua's compliance with applicable laws and regulations; (3) reviewing compliance with Evoqua's Code of Ethics and Business Conduct (the "Code of Conduct"); (4) reporting compliance issues that may have significant implications to the Audit Committee and/or the Disclosure Committee; (5) ensuring that all anonymous whistleblower complaints are provided to the Company's Audit Committee and that all complaints are completely and fully investigated and that any appropriate remedial action is taken based on the results of the investigation; (6) ensuring that the Company's existing non-retaliation policies are complied with in order to protect any Evoqua employee who reports a complaint via the Compliance Helpline, website, or by other means; and (7) reporting annually to the Audit Committee about matters the Risk Committee addressed in the prior year, and in consultation with the Audit Committee, implementing changes to Evoqua's policies and internal controls as necessary.

**Enhancements to the Director of Ethics & Compliance Position:** The responsibilities and duties of Evoqua's Director of Ethics & Compliance shall include, *inter alia*, the following: (a) working with the Risk Committee to evaluate and define the goals of the Company's ethics and compliance program in light of trends and changes in laws that may affect Evoqua's compliance with laws relating to the Company's risk exposure; (b) advising the Risk Committee and acting as the liaison between the Risk Committee, the Disclosure Committee, Evoqua's executive officers, and the Audit Committee; (c) providing quarterly written reports to the Audit Committee evaluating, identifying areas of weakness or concern, reporting on investigations conducted, and following up on remediation for areas of weakness or concerns that may have been identified in earlier periods; and (d) providing at each regularly-scheduled Audit Committee meeting a summary of the types of whistleblower complaints received by the Company's Compliance Helpline or otherwise, as well as any material information resulting from any internal investigation into such complaints.

**Additions to the Compensation Committee Charter:** In determining, setting, or approving annual compensation arrangements for Evoqua's executive officers, the Compensation Committee shall take into account the particular executive's performance as it relates to both legal compliance and compliance with the Company's internal policies and procedures.

**Employee Training in Risk Assessment and Compliance:** Evoqua shall institute biennial training (a) to all employees regarding compliance with Evoqua's Code of Conduct and other manuals or policies established by Evoqua concerning legal or ethical standards of conduct to be observed in connection with work performed for Evoqua, and (b) to the relevant employee population regarding risk assessment and compliance with the tenets of GAAP applicable to the employee's functional area of responsibility. These two types of training may occur in alternate

years, as appropriate to the person's functional area of responsibility, except both types of training shall be provided to newly hired employees promptly.

**Director Education:**

Evoqua shall amend its Corporate Governance Guidelines as necessary to set a goal that each member of the Board aim to attend, on average, four (4) hours per year of continuing education programs designed for directors of publicly-traded companies.

\*          \*          \*

As discussed in more detail below, the Revised Practices represent a material and substantial improvement in Evoqua's corporate governance structure and will help to prevent a recurrence of the wrongdoing alleged in the Consolidated Action and the Demand. Courts have recognized that corporate governance reforms such as the Revised Practices "provide valuable benefits to public companies." *In re NVIDIA Corp. Derivative Litig.*, No. 06-06110, 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22, 2008) (quoting *Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005)); *accord Unite Nat'l Ret. Fund v. Watts*, No. Civ.A. 04CV3603DMC, 2005 WL 2877899, at *5 (D.N.J. Oct. 28, 2005) (recognizing "the great benefit conferred upon [the company] as a result of the new corporate governance principles provided for in the settlement agreement" and noting that the new principles "will serve to prevent and protect [the company] from the reoccurrence of certain alleged wrongdoings").

## IV.     THE SETTLEMENT MERITS PRELIMINARY APPROVAL

### A.     Applicable Legal Standards

A shareholder derivative action may be settled or dismissed only with the Court's approval. *See* Fed. R. Civ. P. 23.1(c). At the preliminary approval stage, the Court "make[s] a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of the . . . proposed settlement, and date of the fairness hearing."

*Manual for Complex Litigation* (Fourth) § 21.632 (2004); *see also Battaline v. Advest, Inc.*, No. 06-569, 2008 WL 11510309, at *5 (W.D. Pa. Mar. 20, 2008). In determining whether preliminary approval is warranted, the Court is required to determine whether the proposed Settlement "discloses grounds to doubt its fairness or other obvious deficiencies and whether it appears to fall within the range of possible approval." *Battaline*, 2008 WL 11510309, at *5 (quoting *Mehling v. New York Life Ins. Co.*, No. 99-5417, 2007 WL 3145344, *1 (E.D. Pa. Oct. 24, 2007)); *see also Manual for Complex Litigation* (Fourth) § 13.14 (2004). At the preliminary approval stage, the Court does not make a final determination as to whether the proposed Settlement is fair and reasonable. Preliminary approval is usually granted unless the settlement is "obviously deficient." *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 438, 445 (E.D. Pa. 2008).[6]

Courts in the Third Circuit look to the factors outlined in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), to determine whether a proposed settlement of a derivative action warrants approval. *See In re Intel Corp. Derivative Litig.*, No. CIV.A. 09-867-JJF, 2010 WL 2955178, at *1 (D. Del. July 22, 2010) (applying the *Girsh* factors to consider final approval of proposed derivative settlement). Although the *Girsh* factors are generally considered during the final approval stage of a proposed settlement, they remain "relevant to guide the Court at the preliminary stage as well." *Vinh Du v. Blackford*, No. 17-cv-194, 2018 WL 4691046, at *6 (D. Del. Sept. 28, 2018); *Singleton v. First Student Mgmt. LLC*, No. CIV.A. 13-1744 JEI, 2014 WL 3865853, at *5 (D.N.J. Aug. 6, 2014) ("While the issue of final settlement approval is not presently before the

---

[6] "The role of the court and the criteria considered in evaluating the adequacy and fairness of a derivative settlement are substantially the same as in the class action." 7 Alba Conte & Herbert Newberg, Newberg on Class Actions § 22.110, at 476 (4th ed. 2002). Accordingly, in determining the standards applicable to approval of a derivative settlement, "cases involving dismissal or compromise under Rule 23(e) of non-derivative class actions . . . are relevant by analogy." *See* 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 3D § 1839, at 195 (2007).

Court, it is important to consider the final approval factors during this stage so as to identify any potential issues that could impede the offer's completion.").

> The *Girsh* factors include:
>
> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the shareholders to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the derivative action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement agreement in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Intel Corp.*, 2010 WL 2955178, at *1 (quoting *Girsh*, 521 F.2d at 157). "Within the context of these factors, the decision to grant or deny approval of a settlement rests within the discretion of the Court." *Id.*

Here, the *Girsh* factors, to the extent they are relevant at the preliminary approval stage, favor approval of the Settlement.

## B.    <u>The Settlement Is Within the Range of Possible Final Approval</u>

The Settlement was reached through adversarial, arm's-length negotiations by experienced counsel and, thus, is presumptively fair and reasonable. The Settlement falls within the range of reasonableness for purposes of preliminary approval because it provides substantial benefits to Evoqua and its stockholders, particularly when balanced against the risks, expense, and uncertainty of continued litigation. Accordingly, the Settlement should be preliminarily approved.

### 1.    The Settlement Is the Product of Arm's Length Negotiations and Is Therefore Presumptively Fair and Reasonable

In evaluating a settlement for preliminary approval, the court's analysis "often focuses on whether the settlement is the product of arms-length negotiations." *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 WL 1068807, at *2 (E.D. Pa. May 11, 2004) (internal quotation marks omitted). Courts will presume that settlements are fair, reasonable and adequate

when they result from "arms-length negotiations conducted by experienced and highly capable counsel." *In re Metro. Life Ins. Co. Sales Practices Litig.*, 1999 WL 33957871, at *26 (W.D. Pa. Dec. 28, 1999); *see also Haas v. Pittsburgh Nat'l Bank*, 495 F. Supp. 815, 818 (W.D. Pa. 1980) (declining to modify a settlement where the provision at issue "resulted from the good faith and arms length negotiations between experienced counsel"). Courts have found that a mediator's involvement in settlement supports the notion that a settlement was negotiated at arm's length and is therefore fair and reasonable. *Jackson v. Wells Fargo Bank, N.A.*, No. 2:12-cv-01262-DSC, 2014 WL 12600178 (W.D. Pa. Oct. 27, 2014) ("The assistance of an experienced, court-appointed mediator in the settlement process supports the Court's conclusion that the Settlement was fairly negotiated at arm's length."); *Yang v. Focus Media Holding Ltd.*, No. 11 Civ. 9051 (CM) (GWG), 2014 WL 4401280, at *5 (S.D.N.Y. Sept. 4, 2014) ("The participation of this highly qualified mediator strongly supports a finding that negotiations were conducted at arm's length and without collusion."). Additionally, courts look to the length of the negotiations and search for indicia of zealous negotiation in evaluating proposed settlements. *See, e.g.*, *Mehling v. New York Life Ins. Co.*, 246 F.R.D. 467, 473 (E.D. Pa. 2007) (preliminarily approving settlement where the parties engaged in "hard-fought and lengthy negotiation[s]" that lasted more than one year); *In re Auto. Refinishing Paint Antitrust Litig.*, 2004 WL 1068807, at *2 (preliminary approval granted where settlement was reached "after extensive arm's-length negotiation between very experienced and competent counsel" for the settling parties).

Here, the Parties reached the proposed Settlement terms through adversarial, arm's-length negotiations by experienced counsel with the assistance of a highly skilled mediator, and the Settlement represents a hard-fought, substantial recovery for Evoqua. The Parties' negotiations began in late 2020. The Parties attended a full-day mediation session via video-conference on

March 19, 2021. The mediation session did not result in the Parties agreeing to a settlement, and the Plaintiffs, Merkwan, and the Defendants continued to engage in settlement negotiations over the next seven and a half weeks, which included the exchange of written proposals for certain corporate governance changes that Evoqua might adopt in response to Plaintiffs' and Merkwan's claims. After agreeing to the material terms of the Settlement on May 10, 2021, the parties then engaged in negotiations over the amount of the Fees and Expenses Award, ultimately agreeing to a double-blind proposal by the Mediator on July 22, 2021. The protracted and adversarial nature of the Parties' negotiations that were engaged in with the assistance of the Mediator weighs in favor of preliminary approval of the Settlement.

The fact that the Parties began negotiating the Fees and Expenses Award only *after* having agreed to the material terms of the settlement also weighs in favor of preliminary approval of the Settlement. *In re Chickie's & Pete's Wage & Hour Litig.*, No. 12-6820, 2014 WL 911718, at *4 (E.D. Pa. Mar. 7, 2014) (recognizing that the fact that attorneys' fees were not negotiated until after the material terms of the settlement had been agreed upon further demonstrated the fairness of the settlement because "the amount of attorneys' fees could not have affected the amount of [the] recovery"); *c.f. In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 852, 864–65 (W.D. Pa. 1995) (noting the concern that if plaintiffs' attorneys and defendants negotiate settlements in derivative litigation *simultaneously* with attorney fees, they may enter a settlement that is adverse to the interests of the plaintiffs by exchanging a low settlement amount for high attorney fees). Moreover, the precise amount that the Parties agreed would be paid as the Fees and Expenses Award was the result of the Mediator's proposal. The substantial assistance from the Mediator in this case lends particular support to the conclusion that the Settlement was fairly negotiated at arm's length. *See Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *5 ("The participation of this highly

qualified mediator strongly supports a finding that negotiations were conducted at arm's length and without collusion.").

### 2. The Settlement Confers Substantial and Material Benefits on Evoqua

The Third Circuit has held that the principal factor in determining the fairness of a derivative settlement is "the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978). Corporate governance reforms "designed to prevent a reoccurrence of the alleged wrongdoings" provide "immediate and substantial benefits for all parties" and should be approved. *Unite Nat'l Ret. Fund v. Watts.*, No. Civ.A. 04CV3603DMC, 2005 WL 2877899, at *1, *4 (D.N.J. Oct. 28, 2005) (approving corporate governance settlement).

Here, Evoqua and the Board acknowledge and agree that the filing, pendency, and settlement of the Consolidated Action and the Demand constitute the primary cause of the Company's decision to adopt and implement the Revised Practices, which are new and beneficial to Evoqua and its stockholders. Stipulation, ¶3. The benefits conferred upon Evoqua and its stockholders as a result of the Revised Practices are immediate, substantial, and long-lasting, and are specifically designed to protect Evoqua and its reputation for its own benefit and for the benefit of its shareholders. The Revised Practices will help bring Evoqua's internal procedures into compliance with best practices, provide increased value to the Company, significantly enhance long-term shareholder value, and protect Evoqua and its shareholders from a reoccurrence of the recent damaging events. Sound and effective corporate governance confers real economic value to publicly traded companies and their shareholders by empowering boards to exercise effective oversight, thereby improving management and producing better operational and risk management decisions, which correlate with higher company profits. Additionally, improved corporate governance and board oversight substantially reduce the risks of costly regulatory and legal

exposure and help restore and preserve the Company's credibility with investors. Courts have long recognized that corporate governance reforms like those provided for in the Settlement here confer a substantial benefit on the corporation. *See, e.g.*, *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395–96 (1970) (explaining that shareholder derivative suits resulting in nonpecuniary settlements convey a "substantial benefit" on the corporation and thus furnish a benefit to all shareholders); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) (citing Fourth, Fifth, and Sixth Circuit Courts of Appeal precedent in which those courts recognized that corporate governance reforms provide valuable benefits to corporations and their public stockholders).

The Revised Practices adopted pursuant to the Settlement confer a substantial benefit on Evoqua and demonstrate that the Court should preliminarily approve the Settlement.

### 3.    The Settlement Appropriately Balances the Significant Risks of Continued Litigation with the Benefits Conferred Upon Evoqua and Its Stockholders

The Third Circuit has stated that "[t]he adequacy of the recovery provided the corporation by the settlement must be considered in the light of the best possible recovery, of the risks of establishing liability and proving damages in the event the case is not settled, and of the cost of prolonging the litigation." *Shlensky v. Dorsey*, 574 F.2d 131 at 147. The uncertainties, risks, and costs associated with the continued prosecution of the Consolidated Action demonstrate that the proposed Settlement should be approved.

Although Plaintiffs believe that the Consolidated Action has substantial merit, there exist significant risks in continuing to prosecute the suit. For example, while the Consolidated Action was stayed, the court in the Securities Class Action dismissed three of the six claims brought by the Securities Class Action plaintiffs and dismissed a fourth claim as against two defendants. Even if Plaintiffs in the Consolidated Action were to withstand Defendants' anticipated motion to dismiss, continued pursuit of litigation would cause the Parties to incur great costs. In contrast to

the obstacles and uncertainties inherent in this complex derivative litigation, the Settlement guarantees immediate, substantial, and lasting benefits that are unquestionably superior to the very real possibility that Evoqua might recover nothing after years of costly litigation.

Continued litigation would be extremely complex, costly, and of substantial duration. Discovery would need to be completed, depositions would need to be taken, experts would need to be designated, and expert discovery would have to be conducted. Evoqua and the Individual Defendants would invariably submit and file motions for summary judgment, which would have to be briefed and opposed by Plaintiffs, as well as argued. Additionally, a trial would have to be held. Even if liability were established, the amount of recoverable damages would still have posed significant issues to be litigated. Thus, the substantial benefits and value conferred on Evoqua, when compared to the significant expense and uncertainty of continued litigation, support preliminary approval of the Settlement. *See In re Rent-Way Secs. Litig.*, 305 F.Supp.2d 491, 501 (W.D. Pa. 2003) (upholding a class action settlement while noting that "a future recovery, even one in excess of the proposed Settlement, may ultimately prove less valuable to the Class than receiving the benefits of the proposed Settlement at this time"); *Maher v. Zapata Corp.*, 714 F.2d 436, 467 (5th Cir. 1983) (explaining that avoiding distractions to management, further litigation costs, and threatened impairment of a corporation's credit and goodwill "are important and valid reasons for seeking a settlement").

It is also far from clear that any favorable judgment would ultimately be sustained following post-trial motions or upon appeal. For example, in *In re Apollo Grp., Inc. Sec. Litig.*, No. CV 04-2147, 2008 WL 3072731, at *6 (D. Ariz. Aug. 4, 2008), *rev'd and remanded*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010), the trial court, on a motion for judgment as a matter of law, overturned a jury verdict of $277 million in favor of stockholders based on

insufficient evidence presented at trial to establish loss causation. The jury verdict was later reinstated on appeal but only after two more years of litigation and legal expenses for the parties. *See In re Apollo Grp., Inc. Sec. Litig.*, No. 08-16971, 2010 WL 5927988, at *1 (9th Cir. June 23, 2010). The further uncertainty presented by risks at the post-trial and appellate stages underscores the appropriateness of approving this Settlement, which provides immediate and certain benefits to Evoqua and its shareholders.

It is for these reasons that courts recognize that derivative litigation is "notoriously unpredictable," and, therefore, settlements of stockholder derivative actions and other complex litigation are "particularly favored" and are not to be lightly rejected by the courts. *See Maher*, 714 F.2d at 455; *see also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."); *In re Sch. Asbestos Litig.*, 921 F.2d 1330, 1333 (3d Cir. 1990) (declaring a "policy of encouraging settlement of complex litigation that otherwise could linger for years"). The uncertainties, risks, and costs inherent in this complex action weigh in favor of preliminary approval of the Settlement.

## V.     THE NOTICE PROCEDURES OUTLINED IN THE STIPULATION ARE REASONABLE

The purpose of providing stockholders notice of a proposed settlement is to "apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Bradburn Parent Teacher Store, Inc. v. 3M (Minn. Mining & Mfg. Co.)*, 513 F. Supp. 2d 322, 328 (E.D. Pa. 2007). Here, the Parties propose that within ten (10) days of the Court's entry of an order preliminarily approving the Settlement, notice shall be given by the following methods: (a) posting of the Order Regarding Notice and Procedures for Proposed Settlement

("Preliminary Approval Order"), the Notice, and the Stipulation (including its exhibits) on the investor relations section of Evoqua's corporate website, which will be maintained through the date of the Settlement Hearing; (b) issuance by Evoqua of a press release linking to the Notice on a nationally recognized newswire (*e.g.*, PR Newswire, BusinessWire); and (c) disclosure of the terms of the Settlement by Evoqua through the filing of a Form 8-K with the SEC, which filing shall include a copy of the Notice and shall provide a link to the investor relations page on Evoqua's corporate website where the Preliminary Approval Order, Notice, and the Stipulation may be viewed. Evoqua, on behalf of Defendants, shall be responsible for providing notice of the Settlement in such form and manner as is directed by the Court.

This method of giving notice adequately informs Current Evoqua Shareholders of, *inter alia*: (1) the terms of the Settlement; (2) the date, time, and location of the Settlement Hearing; (3) the Parties' principal contentions; (4) the underlying reasons for the Settlement; and (5) the deadline and procedure for objecting to the Settlement and appearing at the Settlement Hearing, including the consequences of failing to do so.

Plaintiffs respectfully submit that the proposed forms of notice fully satisfy due process requirements because they will fairly and reasonably apprise Current Evoqua Shareholders of the essential terms of the Settlement and afford them an opportunity to present any objections thereto. Numerous courts have approved similar forms of notice and notice distribution plans in connection with settlements of other derivative actions.[7] Accordingly, the Court should approve the Notice

---

[7] *See, e.g.*, *Bushansky v. Armacost*, No. 12-cv-01597-JST, 2014 WL 2905143, at *6 (N.D. Cal. June 25, 2014) (in notice of dismissal plan, requiring a link on defendant's website, a press release to be issued by defendant, and a Form 8-K filing with the SEC); *In re Rambus Inc. Derivative Litig.*, No 06-3513, 2009 WL 166689, at *2 (N.D. Cal. Jan. 20, 2009) (approving settlement where notice was published on company website and in a press release carried on *Business Wire* and filed in a Form 8-K with the SEC).

and the manner of dissemination of the notice of the Settlement that the Parties propose.

## VI.     PROPOSED SCHEDULE

For the Court's consideration, Plaintiffs propose the following schedule for the necessary events leading up to and including the Settlement Hearing. If this schedule is not convenient for the Court, Plaintiffs respectfully request that the Court utilize similar time intervals for the events in amending the proposed Preliminary Approval Order.

| EVENT | DEADLINE |
|---|---|
| Deadline for: (a) posting the Preliminary Approval Order, the Notice, and the Stipulation (including its exhibits) on the investor relations section of Evoqua's corporate website; (b) issuance of a press release linking to the Notice on a nationally recognized newswire; and (c) disclosure of the terms of the Settlement by Evoqua through the filing of a form 8-K with the SEC | No later than ten (10) calendar days after the entry of the Preliminary Approval Order |
| Deadline for Plaintiffs to file and serve their motion for final approval of the Settlement and the Application (including Plaintiff Service Awards) | At least thirty-five (35) calendar days prior to the Settlement Hearing |
| Deadline for any objections by Current Evoqua Shareholders to the Settlement, the Fees and Expenses Award, and/or Plaintiff Service Awards to be filed with the court and served on counsel for the Parties | No later than twenty-one (21) calendar days prior to the Settlement Hearing |
| Deadline to file reply papers in response to objections by Current Evoqua Shareholders, if any | At least seven (7) calendar days prior to the Settlement Hearing |
| Deadline for Evoqua to file with the Court appropriate proof of compliance with the Notice procedures set forth in the Preliminary Approval Order | At least ten (10) calendar days prior to the Settlement Hearing |
| Settlement Hearing date | At least fifty-five (55) calendar days after the entry of the Preliminary Approval Order |

Plaintiffs respectfully request that the Court enter the proposed Preliminary Approval Order and insert a date for the final settlement hearing in paragraph 3. The proposed Preliminary Approval Order is attached as Exhibit B to the Stipulation and is also submitted herewith.

## VII.    CONCLUSION

The Settlement meaningfully addresses the issues Plaintiffs raised concerning Evoqua's disclosure controls and accounting practices, and the Settlement therefore provides an excellent resolution for Evoqua of this Consolidated Action and the Demand, matters of substantial complexity and cost.   Therefore, Plaintiffs respectfully request that the Court preliminarily approve the Settlement, direct the issuance of the notice of the Settlement, and schedule the Settlement Hearing to consider final approval of the Settlement.

Respectfully submitted,

Dated: August 3, 2021

**LAW OFFICE OF LEON AUSSPRUNG, MD, LLC**

 /s/ James E. Hockenberry
James E. Hockenberry (P.A. I.D. 91133)
1800 John F. Kennedy Boulevard
Suite 1500
Philadelphia, PA  19103
Telephone: (215) 717-0744
888-800-5731 (f)
JH@aussprunglaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, New York 10017
Telephone: (516) 922-5427
tbrown@thebrownlawfirm.net

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
pkim@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*