**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE EVOQUA WATER TECHNOLOGIES CORP. DERIVATIVE LITIGATION | Lead Case No. 2:19-cv-00410-MPK |

**PLAINTIFFS' MOTION FOR**
**FINAL APPROVAL OF DERIVATIVE SETTLEMENT**

Plaintiffs Dallas Torgersen and Robert Hyams ("Plaintiffs"), derivatively on behalf of Evoqua Water Technologies Corp. ("Evoqua" or the "Company"), hereby move this Court, pursuant to Rule 23.1(c) of the Federal Rules of Civil Procedure, for final approval of the Settlement set forth in the Stipulation and Agreement of Settlement, dated July 28, 2021 ("Stipulation),[1] and respectfully request the Court enter the [Proposed] Final Order and Judgment, which grants final approval of the Settlement in its entirety, including Plaintiffs' Counsel's Fees and Expenses Award and Plaintiff Service Awards, for the reasons set forth in the Memorandum of Law and Declaration of Timothy Brown in support of this motion and filed concurrently herewith.

Dated: September 28, 2021

**LAW OFFICE OF LEON AUSSPRUNG, MD, LLC**

*/s/ James E. Hockenberry*
James E. Hockenberry (P.A. I.D. 91133)
1800 John F. Kennedy Boulevard, Suite 1500
Philadelphia, PA 19103
Telephone: (215) 717-0744
JH@aussprunglaw.com

---

[1] Unless otherwise stated, all capitalized terms used herein shall have the same meanings as set forth in the Stipulation, which is attached as Exhibit 1 to the Declaration of Timothy Brown in support of Plaintiffs' Unopposed Motion for Preliminary Approval of Derivative Settlement. ECF No. 20-1.

**THE BROWN LAW FIRM, P.C.**
Timothy Brown (admitted *pro hac vice*)
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
tbrown@thebrownlawfirm.net
*Co-Lead Counsel for Plaintiffs*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (admitted *pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
pkim@rosenlegal.com
*Co-Lead Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE EVOQUA WATER TECHNOLOGIES CORP. DERIVATIVE LITIGATION | Lead Case No. 2:19-cv-00410-MPK |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT**

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

I.      PRELIMINARY STATEMENT ........................................................................ 1

II.     FACTUAL BACKGROUND, PROCEDURAL HISTORY, AND SETTLEMENT ....... 2

III.    PRELIMINARY APPROVAL AND NOTICE TO EVOQUA STOCKHOLDERS ......... 2

IV.     TERMS AND BENEFITS OF THE SETTLEMENT ....................................... 3

V.      THE STANDARDS OF GOVERNING FINAL APPROVAL ......................... 6

VI.     THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ........................... 8

    A.      The Settlement Is Presumptively Fair ................................................... 8

    B.      The Settlement Provides a Substantial Benefit to the Company and Its
        Stockholders ......................................................................................... 9

    C.      The Remaining *Girsh* Factors Weigh in Favor of the Court Approving the
        Settlement ........................................................................................... 13

        1.      The Complexity, Expense, and Likely Duration of the Litigation ........... 13

        2.      The Reaction of Stockholders to the Settlement ...................................... 14

        3.      The Stage of the Proceedings ................................................................. 14

        4.      The Risks of Establishing Liability and Damages ................................... 15

VII.    THE FEES AND EXPENSES AWARD IS FAIR AND REASONABLE ...................... 18

    A.      Unopposed Fees Negotiated at Arm's-Length Are Favored ................................ 18

    B.      The Fees and Expenses Award Is Supported by Relevant Factors ...................... 19

        1.      The Results Obtained and Fee Awards in Comparable Cases ................. 20

        2.      Counsel's Qualifications, Experience, Skill, and Reputation ................. 22

        3.      The Complexity and the Duration of the Litigation ................................ 23

        4.      Amount of Time Devoted ....................................................................... 23

        5.      The Contingent Nature of the Fees Supports Reasonableness of the
        Fees and Expenses Award ...................................................................... 24

     C.     The Requested Plaintiff Service Awards for Plaintiffs Are Reasonable .............. 25

VIII.   CONCLUSION ................................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bell Atl. Corp. v. Bolger*,
  2 F.3d 1304 (3d Cir.1993) ........................................................................... 6, 7

*In re Arena Pharms., Inc. S'holder Derivative Litig.*,
  No. 37-2010-00101051-CU-BT-CTL (Cal. Super. Ct.-San Diego Cty. Dec. 16, 2011) .......... 21

*In re AT&T Corp.*,
  455 F.3d 160 (3d Cir. 2006) ......................................................................... 19, 23

*Bredbenner v. Liberty Travel. Inc.*,
  No. 09-905 (MF), 2011 WL 1344745 (D.N.J. Apr. 8, 2011) ...................................... 8

*Burford v. Cargill, Inc.*,
  No. 05-0283, 2012 WL 5471985 (W.D. La. Nov. 8, 2012) ....................................... 24

*In re Caremark Int'l Inc. Derivative Litig.*,
  698 A.2d 959 (Del. Ch. 1996) ...................................................................... 17, 23

*Carson v. Am. Brands, Inc.*,
  450 U.S. 79 (1981) ..................................................................................... 7

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001) ........................................................................ 13, 25

*Cheff v. Mathes*,
  199 A.2d 548 (Del. 1964) ........................................................................... 17

*In re China Med. Corp. Sec. Litig.*,
  No. 8:11-1061 JLS (ANX), 2014 WL 12581781 (C.D. Cal. Jan. 7, 2014) ...................... 8

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ......................................................................... 6

*Desimone v. Barrows*,
  924 A.2d 908 (Del. Ch. 2007) ....................................................................... 17

*In re Gen. Motors Corp. Pick -up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) ......................................................................... 7, 23

*Girsh v. Jepson*,
  521 F.2d 153 (3d Cir. 1975) .................................................................... passim

*Globis Partners, L.P. v. Plumtree Software, Inc.*,
   C.A. No. 1577-VCP, 2007 WL4292024 (Del. Ch. Nov. 30, 2007)........................................ 17

*Golebiowski v. Mega Life & Health Ins. Co.*,
   C.A. No. 3:04-cv-00831-G, 2005 U.S. Dist. LEXIS 614 (N.D. Tex. Jan. 13, 2005) .............. 24

*Granada Invs., Inc. v. DWG Corp.*,
   962 F.2d 1203 (6th Cir. 1992) ............................................................................................ 16

*Guttman v. Huang*,
   823 A.2d 492 (Del. Ch. 2003)............................................................................................. 17

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983)............................................................................................................ 18

*In re Ins. Brokerage Antitrust Litig.*,
   297 F.R.D. 136 (D.N.J. Aug. 1, 2013) ................................................................................. 8

*In re Invacare Derivative Litig.*,
   No. 1:11-cv-01893 (N.D. Ohio Nov. 15, 2012) ................................................................ 21

*In re Xcel Energy, Inc.*,
   364 F. Supp. 2d 980 (D. Minn. 2005) ................................................................................. 7

*Kamen v. Kemper Fin. Servs.*,
   500 U.S. 90 (1991).............................................................................................................. 16

*Lindy Bros. Builders of Phila. v. Am. Radiator & Standard Sanitary Corp.*,
   487 F.2d 161 (3rd Cir. 1973) ............................................................................................. 24

*Maher v. Zapata Corp.*,
   714 F.2d 436 (5th Cir. 1983) ................................................................................... 7, 16, 23

*Malone v. Brincat*,
   722 A.2d 5 (Del. 1998) ...................................................................................................... 16

*In re MannKind Corp. Derivative Litig.*,
   No. 2:11-cv-05003 (C.D. Cal. Nov. 19, 2012) .................................................................. 21

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Tr. Co.*,
   834 F.2d 677 (7th Cir.1987) ................................................................................................ 7

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970)..................................................................................................... 10, 20

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ....................................................................................... 24

*O'Brien v. Brain Research Labs, LLC,*
 No. 12–204, 2012 WL 3242365 (D.N.J. Aug. 9, 2012)...........................................................15

*In re Ocean Power Technologies, Inc.,*
 C.A. No. 12-6172, 2016 WL 6778218 (D. N.J. Nov. 15, 2016)..............................................24

*In re Pac. Enters. Sec. Litig.,*
 47 F.3d 373 (9th Cir.1995) .....................................................................................................16

*In re Prudential Ins. Co. of Am. Sales Practice Litig.,*
 148 F.3d 283 (3d Cir. 1998).............................................................................................10, 23

*In re Rite Aid Corp. Sec. Litig.,*
 396 F.3d 294 (3rd Cir. 2005) ...........................................................................................23, 24

*In re Royal Dutch/Shell Transp. Sec. Litig.,*
 No. 04-374 (JAP), 2008 WL 9447623 (D.N.J. Dec. 8, 2008) ...............................................23

*In re Santander Consumer USA Holdings, Inc. Deriv. Litig.,*
 C.A. 11614-VCG (Del. Ch. Jan. 20, 2021) ............................................................................20

*In re Sch. Asbestos Litig.,*
 921 F.2d 1330 (3d Cir. 1990)...................................................................................................7

*In re Schering-Plough Corp. S'holders Derivative Litig.,*
 No. 01–1412, 2008 WL 185809 (D.N.J. Jan. 14, 2008) ...................................................10, 19

*Shlensky v. Dorsey,*
 574 F.2d 131 (3d Cir. 1978)........................................................................................6, 10, 20

*Smiley v. Sincoff,*
 958 F.2d 498 (2d Cir. 1992)....................................................................................................19

*In re SmithKline Beckman Corp. Sec. Litig.,*
 751 F. Supp. 525 (E.D. Pa. 1990) ...........................................................................................25

*In re Tile Shop Holdings, Inc. S'holder Deriv. Litig.,*
 C.A. No. 10884-VCG (Del. Ch. Aug. 23, 2018) ....................................................................20

*Unite Nat'l Ret. Fund v. Watts,*
 No. 04-cv-3603 (DMC), 2005 WL 2877899 (D.N.J. Oct. 28, 2005) ..............................passim

*Vizcaino v. Microsoft Corp.,*
 290 F.3d 1043 (9th Cir. 2002) ................................................................................................24

*Walsh v. Great Atl. & Pac. Tea Co.,*
 96 F.R.D. 632 (D.N.J. 1983), aff'd, 726 F.2d 956 (3d Cir. 1983) ............................................7

*In re Walt Disney Co. Deriv. Litig.*,
　907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)................................. 17

*In re Warfarin Sodium Antitrust Litig.*,
　391 F.3d 516 (3d Cir. 2004)......................................................................... 8, 10, 15

*Weber v. Gov't Emps.' Ins. Co.*,
　262 F.R.D. 431 (D.N.J. 2009)................................................................................. 9

*Weiss v. Mercedes-Benz of N. Am., Inc.*,
　899 F. Supp. 1297 (D.N.J. 1995), *aff'd*, 66 F.3d 314 (3d Cir. 1995)......................... 7

*Westchester Putnam Cty. Heavy & Highway Laborers Local 60 Benefit Funds v. MacMillan*
　(brought on behalf of Stryker Corp.),
　No. 1:10-cv-00284-GJQ (W.D. Mich. Nov. 29, 2012)........................................... 22

*Zimmerman v. Bell*,
　800 F.2d 386 (4th Cir. 1986) ................................................................................. 7

**Rules**

Fed R. Civ. P. 23(c) ....................................................................................... 6, 14, 16

**Other Authorities**

7 Alba Conte & Herbert Newberg,
　*Newberg on Class Actions* §22.110, at 476 (4th ed. 2002)....................................... 7

Pursuant to Fed. R. Civ. P. 23.1(c) of the Federal Rules of Civil Procedure, plaintiffs Dallas Torgersen ("Torgersen") and Robert Hyams ("Hyams," and collectively with Torgersen, "Plaintiffs") respectfully submit this Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Derivative Settlement of this consolidated derivative action (the "Consolidated Action" or the "Derivative Action").[1] The terms of the Settlement[2] are set forth in the Stipulation and Agreement of Settlement dated July 28, 2021 (the "Stipulation"), which is attached as Exhibit 1 to the Declaration of Timothy Brown in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Derivative Settlement. ECF 20-1. Plaintiffs now seek final approval of the Settlement and entry of the [Proposed] Final Order and Judgment ("Final Order and Judgment"). (Stipulation, Ex. D (ECF 20-1).)

## I.    PRELIMINARY STATEMENT

The Settlement creates significant benefits for Evoqua Water Technologies, Corp. ("Evoqua" or the "Company") and is the product of substantial effort, advocacy, and arm's-length negotiations by experienced counsel, with the substantial assistance of Greg Danilow, Esq. of Phillips ADR (the "Mediator"), a highly experienced mediator in complex stockholder litigation. The Settlement creates new and beneficial corporate governance revised practices ("Revised Practices"), which will improve the Company's internal controls and directly address the alleged deficiencies that Plaintiffs contend resulted in the alleged wrongdoing.

Following agreement of the material substantive terms of the Settlement, counsel for the Parties, with the assistance of the Mediator, engaged in good faith, arm's-length negotiations

---

[1] The Settlement also resolves the related litigation demand (the "Demand") on Evoqua's Board made by Mike Merkwan ("Merkwan"), as described herein. Plaintiffs, Merkwan, and Defendants are collectively referred to as the "Parties."

[2] Unless noted otherwise, all capitalized terms used herein shall have the same meaning as set forth in the Stipulation.

regarding the Fees and Expenses Award to be paid to Plaintiffs' Counsel.[3] As reflected in the Stipulation, Evoqua and the Individual Defendants have agreed to cause their insurer(s) to pay $610,000 in attorneys' fees and expenses in recognition of the benefits conferred on Evoqua. (Stipulation, ¶15.)

The Settlement, including the Fees and Expenses Award, is firmly supported by Evoqua and its Board, which "acknowledge and agree that the filing, pendency, and settlement of the Consolidated Action and the Demand constitute the primary cause of the Company's decision to adopt and implement the Revised Practices, which are new and beneficial to Evoqua and its stockholders." (Stipulation, ¶3.)

For these reasons, and those set forth below, Plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate, and should be approved by the Court. Declaration of Timothy Brown in Support of Plaintiffs' Motion for Final Approval of Derivative Settlement, filed herewith ("Brown Decl."), ¶¶ 34-58.

## II.     FACTUAL BACKGROUND, PROCEDURAL HISTORY, AND SETTLEMENT

In order to avoid unnecessary repetition, Plaintiffs respectfully refer the Court to the Brown Declaration, filed contemporaneously herewith, for a detailed summary of the allegations, procedural history, and settlement negotiations of the Derivative Action. (Brown Decl., ¶¶ 9-29.)

## III.    PRELIMINARY APPROVAL AND NOTICE TO EVOQUA STOCKHOLDERS

On August 23, 2021, the Court entered the Order Regarding Notice and Procedures for Proposed Settlement, which granted preliminary approval of the Settlement, approved the form and manner of providing notice of the Settlement to Evoqua stockholders, and set November 2,

---

[3] The Stipulation further provides that Plaintiffs' Counsel may apply to the Court for reasonable service awards for each Plaintiff ("Plaintiff Service Awards"), to be paid upon Court approval from the Fees and Expenses Award.

2021 as the hearing date for the motion for final approval of the Settlement (ECF No. 36) (the "Preliminary Approval Order").

In accordance with the Preliminary Approval Order: on August 26, 2021, Evoqua (a) posted the Preliminary Approval Order, the Notice, and the Stipulation (including its exhibits) on the investor relations section of Evoqua's corporate website; (b) issued a press release linking to the Notice via Business Wire; (c) filed with the SEC a Form 8-K that attached the Notice and the above-referenced press release, announced the Settlement, and provided a link to the webpage on Evoqua's corporate website for viewing the Notice, Stipulation (including its exhibits) and Preliminary Approval Order. (Declaration of John DiMascio Regarding Dissemination of Notice of Settlement (ECF No. 37) ("DiMascio Decl."), ¶¶2-4.)

Pursuant to the Preliminary Approval Order, the Notice directed that any objections to the Settlement must be filed and served by October 12, 2021. (Preliminary Approval Order, ¶8; DiMascio Decl., Ex. 1, ¶36.) To date, Plaintiffs are unaware of any objections. (Brown Decl., ¶39.)

## IV.   TERMS AND BENEFITS OF THE SETTLEMENT

As a result of the filing, pendency, and settlement of the Consolidated Action and the Demand, the Board shall adopt resolutions, amend committee Charters, or adopt corporate governance guidelines to implement the Revised Practices, which are set forth in full in Exhibit A to the Stipulation, and which will address the alleged Board and management-level oversight lapses at issue in the Consolidated Action. (Stipulation, ¶¶2-3.) Pursuant to the Stipulation, Evoqua will implement the Revised Practices for a minimum of five years following the Effective Date of the Settlement. (Stipulation, ¶2.) Key aspects of the Revised Practices, which are fully set forth in Exhibit A to the Stipulation, include, but are not limited to:

**Board Composition and Practices:** The Board shall pass a resolution to, within eighteen months of the approval of the Settlement, replace an existing non-independent director with one new independent director, who shall meet the criteria for director independence set forth in Section 303A.02 of the Listed Company Manual of the New York Stock Exchange.

**Improvements to Risk Management and the Creation of a Risk Committee:** Evoqua shall adopt a resolution and draft a charter formally creating a management-level risk committee (the "Risk Committee"). The Risk Committee shall be primarily responsible for the Company's risk management policies and oversight of the operation of the Company's risk management framework. The Risk Committee shall be responsible for, *inter alia*: (1) monitoring Evoqua's internal risk assessment, including risks reported internally by Evoqua employees; (2) identifying material risks relating to Evoqua's compliance with applicable laws and regulations; (3) reviewing compliance with Evoqua's Code of Ethics and Business Conduct (the "Code of Conduct"); (4) reporting compliance issues that may have significant implications to the Audit Committee and/or the Disclosure Committee; (5) ensuring that all anonymous whistleblower complaints are provided to the Company's Audit Committee and that all complaints are completely and fully investigated and that any appropriate remedial action is taken based on the results of the investigation; (6) ensuring that the Company's existing non-retaliation policies are complied with in order to protect any Evoqua employee who reports a complaint via the Compliance Helpline, website, or by other means; and (7) reporting annually to the Audit Committee about matters the Risk Committee addressed in the prior year, and in consultation with the Audit Committee, implementing changes to Evoqua's policies and internal controls as necessary.

**Enhancements to the Director of Ethics & Compliance Position:** The responsibilities and duties of Evoqua's Director of Ethics & Compliance shall include, *inter alia*, the following:

(a) working with the Risk Committee to evaluate and define the goals of the Company's ethics and compliance program in light of trends and changes in laws that may affect Evoqua's compliance with laws relating to the Company's risk exposure; (b) advising the Risk Committee and acting as the liaison between the Risk Committee, the Disclosure Committee, Evoqua's executive officers, and the Audit Committee; (c) providing quarterly written reports to the Audit Committee evaluating, identifying areas of weakness or concern, reporting on investigations conducted, and following up on remediation for areas of weakness or concerns that may have been identified in earlier periods; and (d) providing at each regularly-scheduled Audit Committee meeting a summary of the types of whistleblower complaints received by the Company's Compliance Helpline or otherwise, as well as any material information resulting from any internal investigation into such complaints.

**Additions to the Compensation Committee Charter:** In determining, setting, or approving annual compensation arrangements for Evoqua's executive officers, the Compensation Committee shall take into account the particular executive's performance as it relates to both legal compliance and compliance with the Company's internal policies and procedures.

**Employee Training in Risk Assessment and Compliance:** Evoqua shall institute biennial training (a) to all employees regarding compliance with Evoqua's Code of Conduct and other manuals or policies established by Evoqua concerning legal or ethical standards of conduct to be observed in connection with work performed for Evoqua, and (b) to the relevant employee population regarding risk assessment and compliance with the tenets of GAAP applicable to the employee's functional area of responsibility. These two types of training may occur in alternate years, as appropriate to the person's functional area of responsibility, except both types of training shall be provided to newly hired employees promptly.

**Director Education:** Evoqua shall amend its Corporate Governance Guidelines as necessary to set a goal that each member of the Board aim to attend, on average, four (4) hours per year of continuing education programs designed for directors of publicly-traded companies.

## V.   THE STANDARDS OF GOVERNING FINAL APPROVAL

Under Rule 23.1, a derivative action "may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23.1(c). To grant its approval, the Court must find that the Settlement is "fair, adequate, reasonable and proper and in the best interests of the … shareholders." *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1310 (3d Cir.1993).[4] In making this determination, the Court considers the following factors: "(1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)); *see also Shlensky v. Dorsey*, 574 F.2d 131, 147-49 (3d Cir. 1978) (recognizing that "the standards annunciated in *Girsh v. Jepson* for class suit settlements have accordingly been applied, although perhaps with somewhat less rigor, in the settlement of shareholders' derivative suits.").

---

[4] Here, as throughout, all internal quotations, citations, and footnotes are deemed omitted all emphasis is deemed added and unless otherwise noted.

The Court's evaluation of a settlement should be guided by the judicial policy that "favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re Gen. Motors Corp. Pick -up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995); *In re Sch. Asbestos Litig.*, 921 F.2d 1330, 1333 (3d Cir. 1990) (courts encourage settlement of complex litigation that "otherwise could linger for years"); *see also* 7 Alba Conte & Herbert Newberg, *Newberg on Class Actions* §22.110, at 476 (4th ed. 2002) ("The role of the court and the criteria considered in evaluating the adequacy and fairness of a derivative settlement are substantially the same as in the class action.").

"Settlements of shareholder derivative actions are particularly favored because such litigation 'is notoriously difficult and unpredictable.'" *In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 1002 (D. Minn. 2005) (quoting *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983)); *see also Zimmerman v. Bell*, 800 F.2d 386, 392 (4th Cir. 1986) ("Settlement here is favored for the reasons that settlements generally are favored: disputes are resolved; the resources of litigants and courts are saved, and, in the case of a derivative action, management can return its attention and energy from the courtroom to the corporation itself.").

Approval of the proposed settlement is a matter within the sound discretion of the Court. *See Weiss v. Mercedes-Benz of N. Am., Inc.*, 899 F. Supp. 1297, 1300 (D.N.J. 1995), *aff'd*, 66 F.3d 314 (3d Cir. 1995). In exercising this discretion, courts "do not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981); *Walsh v. Great Atl. & Pac. Tea Co.*, 96 F.R.D. 632, 642 (D.N.J. 1983), *aff'd*, 726 F.2d 956 (3d Cir. 1983). Indeed, "'the temptation to convert [the] settlement hearing into a full trial on the merits must be resisted.'" *Bell Atl.*, 2 F.3d at 1315 (quoting *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Tr. Co.*, 834 F.2d 677, 684 (7th Cir.1987)).

As set forth in detail below, the Settlement meets all the criteria for the granting of final approval by the Court.

**VI.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE**

    **A.    The Settlement Is Presumptively Fair**

"[A] presumption of fairness exists where a settlement has been negotiated at arm's length, discovery is sufficient, the settlement proponents are experienced in similar matters and there are few objectors." *In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 144 (D.N.J. Aug. 1, 2013) (citing *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004)). Courts have recognized a mediator's involvement in settlement negotiations further supports a settlement's fairness and approval. *See Bredbenner v. Liberty Travel. Inc.*, No. 09-905 (MF), 2011 WL 1344745, at *10 (D.N.J. Apr. 8, 2011) ("Participation of an independent mediator in settlement negotiations 'virtually ensures that the negotiations were conducted at arm's length and without collusion between the parties.'").

Here, the proposed Settlement is the result of extensive arm's-length negotiations by counsel who are experienced in complex litigation. (Brown Decl., ¶¶23-29.) These negotiations, which took place with the assistance of a highly experienced Mediator, occurred over the course of many months and included an all-day mediation session via video teleconference. *Id*. Mr. Danilow's assistance supports the Settlement's approval. *See In re China Med. Corp. Sec. Litig.*, No. 8:11-1061 JLS (ANX), 2014 WL 12581781, at *4 (C.D. Cal. Jan. 7, 2014) (finding settlement reached as a result of mediation before a highly experienced mediator weighs in favor of approval).

During these hard-fought negotiations, the Parties had numerous telephone discussions and written correspondence and exchanged multiple draft proposals regarding the substantive terms of the Settlement. (Brown Decl., ¶27.) After the substantive terms of the Settlement were agreed upon and the Parties executed a settlement term sheet ("Term Sheet"), the Parties began negotiations

regarding the attorneys' fees to be paid to Plaintiffs' Counsel in recognition of the benefits conferred. (*Id.*, ¶29.) The separate negotiation of the Fees and Expenses Award, and resolution of an agreed-to amount with the assistance of the Mediator (who recommended the $610,000 through a double-blind mediator's proposal that was accepted by the Parties), further supports that the Settlement was negotiated at arm's length and was free from fraud and collusion. *See, e.g.*, *Weber v. Gov't Emps.' Ins. Co.*, 262 F.R.D. 431, 451 (D.N.J. 2009) (approving the requested attorneys' fees after noting that "the parties' agreement with regard to attorney's fees was the product of arms'-length negotiations which did not commence until after 'the parties had reached agreement in principle of all the terms relating to relief for the Class'").

Moreover, these arm's-length negotiations took place after Plaintiffs' Counsel had already conducted a thorough factual and legal investigation of the claims, making them extremely knowledgeable about the strength and weaknesses of the derivative claims and defenses thereto. This investigation included a thorough review of Evoqua's public filings, analyst reports, conference calls, and other publicly available information, as well as a review of thousands of documents produced by Defendants prior to mediation. Based upon this knowledge, and Plaintiffs' Counsel's extensive experience prosecuting complex representative actions, Plaintiffs' Counsel believe that these negotiations have produced a Settlement that is fair, adequate, reasonable and in the best interests of the Company and its stockholders.

Finally, to date, there have been no objections to the Settlement. (Brown Decl., ¶39.) Accordingly, the Settlement is entitled to a presumption of fairness.

### B.     The Settlement Provides a Substantial Benefit to the Company and Its Stockholders

"The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the

proposed settlement by the corporation, the real party in interest." *See Shlensky*, 574 F.2d at 147. This "principal factor" is a combination of the last two *Girsh* factors, as the "adequacy of the recovery . . . must be considered in the light of the best possible recovery, of the risks of establishing liability and proving damages in the event the case is not settled, and of the cost of prolonging the litigation." *Id*. at 147; *see also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 538 (citing *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 322 (3d Cir. 1998)).

Corporate governance reforms that "serve to prevent and protect [the company] from the reoccurrence of certain alleged wrongdoings" that resulted in material harm to the corporation confer a substantial benefit on the corporation that warrants settlement approval. *Unite Nat'l Ret. Fund v. Watts*, No. 04-cv-3603 (DMC), 2005 WL 2877899, at *5 (D.N.J. Oct. 28, 2005); *see Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395-96 (1970) ("a corporation may receive a 'substantial benefit' from . . . private stockholders' actions of this sort 'involv[ing] corporate therapeutics' . . . [which] furnish a benefit to all shareholders"); *see also In re Schering-Plough Corp. S'holders Derivative Litig.*, No. 01–1412, 2008 WL 185809, at *5 (D.N.J. Jan. 14, 2008) (recognizing that "corporate governance and compliance mechanisms required by the settlement can prevent breakdowns in oversight that would otherwise subject the company to the risk of regulatory action, or uncover and remedy a problem at the early stages before it becomes the subject of a government investigation. Effective corporate governance can also affect stock price by bolstering investor confidence and improving consumer perceptions.").

Here, the Complaint alleges that the Individual Defendants caused Evoqua to make materially false and misleading statements in press release, earnings conference calls, and filing with the SEC by touting the Company's successful integration efforts, the stability of its sales force, and the Company's financial strength and progress. Further, the Complaint alleges that the

Individual Defendants failed to properly maintain and/or adequately monitor internal controls, which would have prevented the Company from issuing materially false and misleading statements to the public. The Revised Practices are specifically designed to address the deficiencies that resulted in materially misleading disclosures.

For example, the Revised Practices will require the Company to replace an existing non-independent director with one new independent director, who meets the criteria for director independence set forth by the New York Stock Exchange ("NYSE") for public companies. This reform alone will change the composition of the Board, significantly improving the ratio of directors who will scrutinize public disclosures impartially over those who may possess an incentive to paint a rosier picture of the Company.

Further, the Revised Practices will result in the creation of a risk committee (the "Risk Committee"), which will consist of several key executives who will collectively be responsible for monitoring the Company's internal risk, identifying material risks relating to Evoqua's compliance with applicable laws and regulations, and coordinating with the Company's existing Disclosure Committee regarding any required or advisable public disclosure or identified actual or potential risks. The Risk Committee will also report directly to the Board's Audit Committee, providing information regarding material risks relating to the Company's compliance, significant financial implications of compliance issues, and effectiveness of Evoqua's risk management.

The Revised Practices will also implement changes to the Company's compliance personnel and systems such as requiring the Director of Ethics & Compliance to better coordinate with the Audit Committee, the Risk Committee, and the Disclosure Committee, and the executive officers. As part of that coordination, key information will be received by key committees and personnel, including whistleblower complaints and internal investigations.

The Settlement guarantees Evoqua and its stockholders the substantial, immediate, and lasting benefits of enhanced governance reforms that directly address internal control weaknesses that Plaintiffs believe resulted in the alleged wrongdoing. The Settlement will require the Company to replace an existing non-independent director with one new independent director, who shall meet the criteria for director independence set forth in Section 303A.02 of the Listed Company Manual of the NYSE.

Further, the Revised Practices will help bring Evoqua's internal procedures into compliance with best practices, provide increased value to the Company, significantly enhance long-term shareholder value, and protect Evoqua and its shareholders from a reoccurrence of the recent damaging events. Sound and effective corporate governance confers real economic value to publicly traded companies and their shareholders by empowering boards to exercise effective oversight, thereby improving management and producing better operational and risk management decisions, which correlate with higher company profits. (Stip., Ex. A.; Brown Decl. ¶¶43-45.)

Also, improved governance and board oversight substantially reduce the risks of costly regulatory and legal exposure and help restore and preserve Evoqua's credibility with investors.

In sum, the Revised Practices required by the Settlement confer a substantial benefit on Evoqua and its stockholders by significantly improving the Company's compliance controls, thereby helping to prevent a recurrence of the wrongdoing alleged in the Derivative Action. Accordingly, this factor strongly supports final approval of the Settlement. Accordingly, this factor strongly supports final approval of the Settlement. *See Watts*, 2005 WL 2877899, at *2 (benefits clearly weigh in favor of the settlement where "the principles included as part of the [settlement] will have positive effects on board governance, overall compliance, executive compensation, financial and other reporting, and management efforts at a number of levels within the Company").

12

**C.      The Remaining *Girsh* Factors Weigh in Favor of the Court Approving the Settlement**

Of the remaining *Girsh* factors, the following are relevant to this derivative Settlement: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of stockholders to the settlement; (3) the stage of the proceedings and the amount of discovery completed; and (4) the risks of establishing liability and the risks of establishing damages. *See Watts*, 2005 WL 2877899, at *4-5 (other *Girsh* factors non-dispositive for this type of settlement).

**1.      The Complexity, Expense, and Likely Duration of the Litigation**

"This factor captures 'the probable costs, in both time and money, of continued litigation.'" *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001). As an initial matter, "[d]erivative suits are by their nature undeniably complex, and this case is no exception." *Watts*, 2005 WL 2877899, at *3. Not only does this case involve complicated legal issues unique to derivative actions, but its subject matter—supply chain and integration issues related to mission-critical water treatment solutions—is highly technical, and would require significant expert analysis and debate.

Moreover, Defendants strongly deny liability and dispute many of the factual and legal predicates underlying the derivative claims. As such, if the litigation continued, significant document discovery would need to be completed, depositions would have to be taken, experts would be designated and expert discovery conducted, motions to dismiss and expected motions for summary judgment would be briefed and argued, and a trial could occupy attorneys on both sides and the Court for weeks. Additionally, any judgment favorable to Plaintiffs would likely be the subject of post-trial motions and appeal, which would prolong the cases for years with the ultimate outcome uncertain. *See id.* at *3 ("The Court assumes that should this litigation have ensued, the parties would have engaged in a significant amount of discovery, pre-trial motions, an

extensive trial followed by post-trial motions and an appeal, all of which would be at great expense. Also, these circumstances could extend the litigation many months or years.").

Consequently, "the complexity of the case, combined with the potential expense and longer duration of litigation cause this factor to weigh heavily in favor of approval." *Id.* at *3.

### 2.    The Reaction of Stockholders to the Settlement

Courts view the absence of opposition to a settlement by affected parties as a factor strongly supporting judicial approval of the settlement. *See Cendant*, 264 F.3d at 235 ("The vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement . . . ."). Here, Evoqua disseminated the notice of the Settlement in accordance with the process approved by the Court and consistent with the requirements of Rule 23.1 and due process. (DiMascio Decl., ¶¶3-4.) The Notice informed investors of their rights under the Settlement, including by specifying procedures for raising any objections to the Settlement. The deadline for submitting objections is October 12, 2021.  (Preliminary Approval Order, ¶8.) To date, Plaintiffs are unaware of any objection to the Settlement. (Brown Decl., ¶39.)

### 3.    The Stage of the Proceedings

The Court's consideration of the stage of proceedings focuses on "whether class counsel had an adequate appreciation of the merits of the case before negotiating." *Cendant*, 264 F.3d at 235. Thus, even settlements reached at a very early stage and prior to formal discovery will support a settlement if the plaintiff conducted sufficient investigation and was adequately informed about the merits of the case. *See id.* at 236 (finding this factor "cuts strongly in favor of the settlement" even though "litigation was settled at an early stage" because the plaintiff had conducted enough investigation to have "an excellent idea of the merits of its case"). Indeed, courts in this circuit have regularly approved settlements while the case was in the pre-trial stage and formal discovery

had not yet commenced. *See, e.g.*, *id.*; *O'Brien v. Brain Research Labs, LLC*, No. 12–204, 2012 WL 3242365, at *17 (D.N.J. Aug. 9, 2012); *Watts*, 2005 WL 2877899, at *3 (noting that plaintiffs' counsel had conducted "a significant amount of informal discovery and investigation" prior to filing and, thus, "despite the absence of formal discovery and extended motion practice," this factor "weighs in favor of approval" because "the parties fully appreciated the merits of [the] case").

Here, Plaintiffs' Counsel have diligently investigated the derivative claims since before the Derivative Action commenced in April 2019, and, therefore, are well-positioned to assess the merits of the claims. Prior to commencing litigation, Plaintiffs' Counsel conducted an extensive investigation relevant to the Individual Defendants' alleged misconduct and corresponding damages to the Company, which included reviewing news reports, transcripts of conference calls, securities analyst reports, Evoqua's public filings with the SEC, and court documents in related cases. In addition, counsel reviewed and analyzed tens of thousands of documents produced by Defendants prior to the Mediation, which documents informed Plaintiffs' Counsel's view of the merits and appropriate means of resolving the litigation. Plaintiffs' Counsel's collective experience and investigative efforts positioned them to understand the strengths and weaknesses of each claim and to negotiate and obtain the Settlement that provides meaningful relief to the Company.

This factor weighs in favor of approval. *See Watts*, 2005 WL 2877899, at *3.

### 4.    The Risks of Establishing Liability and Damages

The fourth and fifth *Girsh* factors "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement." *Warfarin*, 391 F.3d at 537. In other words, these factors attempt "to measure the expected value of litigating the action rather than settling it at the current time." *Cendant*, 264 F.3d at 238. Both factors strongly weigh in favor of approval in this case.

15

In evaluating settlements of derivative actions, courts have long recognized that such cases "[are] 'notoriously difficult and unpredictable.'" *Maher*, 714 F.2d at 455; *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) (same); *Zimmerman*, 800 F.2d at 392 (4th Cir. 1986) (same). The Derivative Action here is no different. If the Derivative Action was to proceed, Plaintiffs would face substantial risks. *See In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir.1995) (the "odds of winning [a] derivative lawsuit [are] extremely small" because "derivative lawsuits are rarely successful."); *Watts*, 2005 WL 2877899, at \*4 ("Here, Plaintiffs face the 'difficulties inherent in derivative litigation as well as significant procedural and substantive obstacles.'").

Although it is not the Court's role at this stage of the litigation to evaluate the merits, the Derivative Action presented serious questions of law and fact, which made liability highly uncertain. Indeed, Plaintiffs faced significant obstacles to even reaching the merits, not to mention a successful result at trial. Plaintiffs would need to survive Defendants' anticipated motions to dismiss, which would necessarily include contentious briefing and argument as to whether Plaintiffs satisfied the demand requirements set forth in Rule 23.1. (Brown Decl., ¶52.)

There is a real risk the Derivative Action would not have withstood Defendants' anticipated motion to dismiss, especially given the heightened pleading requirements under Rule 23.1 for demand futility, which is satisfied only under "extraordinary conditions." *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 96 (1991). To overcome a pleading challenge under Rule 23.1, Plaintiffs needed to establish that at least five of out ten directors on the Board were not sufficiently independent to consider a demand or knowingly breached their fiduciary duty to oversee the Company. *Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1998). A director is interested where he or she is subject to a "substantial likelihood of liability." *Id.* At the time the complaint was filed in the

16

*Hyams* Action, the Board included the following ten directors: Defendants Keating, Lamb, Gregg, Bhambri, Cappeline, Hoesterey, Kumar, and Wilver and non-parties Lynn Swann and Lisa Glatch. (Brown Decl., ¶¶54-55.) Plaintiffs would likely be able to show futility with respect to Defendant Keating, who was the CEO and also a defendant in the related Securities Class Action. Plaintiffs allege that the remaining named directors were subject to a substantial likelihood of liability due to the scheme they engaged in to make and/or cause Evoqua to make misleading statements and for improper insider sales. (Brown Decl., ¶55.) Liability, however, is predicated on a breakdown in the Board's oversight responsibilities, which courts have described as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996); *Globis Partners, L.P. v. Plumtree Software, Inc.*, C.A. No. 1577-VCP, 2007 WL4292024, at *7 (Del. Ch. Nov. 30, 2007) (same); *Desimone v. Barrows*, 924 A.2d 908, 939 (Del. Ch. 2007) (same); *Guttman v. Huang*, 823 A.2d 492, 506 n.33 (Del. Ch. 2003) (same).

Further, Plaintiffs' allegations regarding improper insider sales face challenging hurdles as "particularized facts . . . that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time . . . they knew material, non-public information" are needed to establish demand futility. *See Guttman*, 823 A.2d at 502. (Brown Decl., ¶56.)

Even if the derivative claims survived these initial hurdles, the litigation would remain hard-fought and highly contentious through discovery, motions for summary judgment, additional pre-trial motions, trial, and appeal. *See In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (verdict for defendants on breach of fiduciary duty and corporate waste claims); *Cheff v. Mathes*, 199 A.2d 548, 557 (Del. 1964) (reversing verdict for

derivative plaintiffs following trial and ordering judgment entered for defendants). (Brown Decl., ¶57.)

Plaintiffs' Counsel's ability to achieve the Settlement, in the face of these obstacles, is a testament to the Settlement's fairness and reasonableness and supports final approval of the Settlement. Thus, the fourth and fifth *Girsh* factors also support the Settlement's approval.

## VII.   THE FEES AND EXPENSES AWARD IS FAIR AND REASONABLE

Plaintiffs' Counsel's efforts in prosecuting the Derivative Action and negotiating the Settlement have conferred substantial benefits upon Evoqua. In light of the benefits achieved, Evoqua and the Individual Defendants agreed to cause their insurance carriers to pay $610,000 for Plaintiffs' Counsel's fees and expenses, subject to Court approval. As detailed below, the agreed-upon Fees and Expenses Award is fair and reasonable and warrants this Court's approval.

### A.   Unopposed Fees Negotiated at Arm's-Length Are Favored

The U.S. Supreme Court has endorsed this type of consensual resolution of attorneys' fees as the ideal toward which litigants should strive. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee.").

Here, the Parties negotiated the Fees and Expenses Award after the substantive terms of the Settlement were agreed upon and the Term Sheet was executed, with the assistance of the Mediator. (Brown Decl., ¶29.) Indeed, not only did the Mediator assist in negotiations, but the $610,000 amount was the result of a specific recommendation provided through a double-blind mediator's proposal by the Mediator, which the Parties all accepted.  (*Id.*)  Unlike in class actions, where the diverging interests of class counsel and absent class members warrants judicial scrutiny of fee requests that are uncontested by defendants given that the fees are a portion of the settlement fund to be to class members, which fund comprises the only payments made by defendants, in the

Derivative Action, Evoqua and its insurers were directly involved, represented by counsel, and had every incentive to negotiate the lowest reasonable fee. (*Id.*, ¶58.) These negotiations, among highly experienced counsel, were based on an informed analysis of the appropriate fee range in light of the Settlement benefits' value, contingency risk, and fees approved by courts in comparable cases. (*Id.*) Also, the Fees and Expenses Award will not come out of Evoqua's coffers, and instead will be paid by Evoqua's and the Individual Defendants' insurance carriers. (*Id.*, ¶59.)

In such circumstances, the result of those negotiations—reflecting all Parties' experiences as to what is appropriate—is entitled to a great deal of judicial weight. *See Smiley v. Sincoff*, 958 F.2d 498, 501 (2d Cir. 1992) ("settlement between the parties of the fee amount is encouraged"); *Schering-Plough*, 2008 WL 185809, at *4-6 (approving request for $9.5 million in attorneys' fees in settlement involving only corporate governance reforms, noting that the proposed fee award was the product of mediation, in which the mediator indicated that he was '"fully satisfied with the resolution the parties reached with respect to plaintiffs' counsels' compensation'").

## B.    The Fees and Expenses Award Is Supported by Relevant Factors

In determining whether a requested award of attorneys' fees is fair and reasonable, courts within the Third Circuit typically consider the following factors: (1) the results obtained as compared to awards in similar cases; (2) the skill and efficiency of the attorneys; (3) the complexity and duration of the litigation; (4) the risk of nonpayment; and (5) the amount of time devoted. *See, e.g.*, *In re AT&T Corp.*, 455 F.3d 160, 165 (3d Cir. 2006). The Third Circuit has cautioned that these factors are not to be applied in a formulaic manner, but rather in a way that evaluates "what . . . counsel actually did and how it benefitted the class." *Id.* at 165-66. An analysis of these factors illustrates that the agreed upon Fees and Expenses Award is reasonable and should be approved.

1.      **The Results Obtained and Fee Awards in Comparable Cases**

It is well established that, where a derivative action provides substantial benefits to a corporation, plaintiffs' counsel are entitled to an award of reasonable attorneys' fees pursuant to the substantial benefit doctrine. *See, e.g.*, *Mills*, 396 U.S. at 395; *Shlensky*, 574 F.2d at 149 ("[T]he plaintiffs in a shareholder[] derivative action may, thus, recover their expenses, including attorneys' fees, from the corporation on whose behalf their action is taken if the corporation derives a benefit, which may be monetary or non-monetary, from their successful prosecution or settlement of the case.").

The fee awards approved in comparable derivative settlements confirm the reasonableness of the agreed-to Fees and Expenses Award of $610,000. In a derivative action brought on behalf of Tile Shop Holdings, Inc. asserting claims arising out of accounting issues and illicit self-dealing through undisclosed related-party transactions, Vice Chancellor Glasscock valued the addition of a new independent director *alone* to be worth $1 million. *See In re Tile Shop Holdings, Inc. S'holder Deriv. Litig.*, C.A. No. 10884-VCG, at 42:8-11 (Del. Ch. Aug. 23, 2018) (TRANSCRIPT) (Brown Decl., Ex. 4) (finding in *contested*, i.e., vigorously litigated, fees application that "a million dollars was a proper plaintiff firm recovery for achieving [an] independent director alone," and awarding additional $250,000 in fees for other modest corporate governance reforms). Similarly, in a derivative action brought on behalf of Santander Consumer USA Holdings, Inc. where a new committee was formed in addition to enhancing existing committee charters and practices, requiring accounting reports and whistleblower policy improvements, the Chancery Court valued these reforms as at least $1.5 million – in approving $1.5 million in agreed-to attorneys' fees. *See In re Santander Consumer USA Holdings, Inc. Deriv. Litig.*, C.A. 11614-VCG (Del. Ch. Jan. 20, 2021) (TRANSCRIPT) (Brown Decl., Ex. 5).

Further, several derivative settlements involving false and misleading statements, and which ultimately settled based on corporate governance reforms—have approved fees and expenses awards in excess of $1 million. (Brown Decl., ¶68 (citing *In re MannKind Corp. Derivative Litig.*, No. 2:11-cv-05003, slip op. (C.D. Cal. Nov. 19, 2012) (awarding approximately $1,236,500 in fees in a derivative action that settled for the following governance: establishing a management-level Disclosure Committee tasked with maintaining and overseeing disclosure controls and procedures and ensuring disclosures are accurate; Audit Committee oversight over the Disclosure Committee, including quarterly meetings with the Chair of Disclosure Committee; and enhanced independence requirements) (Brown Decl., Ex. 6), and *Mannkind* Stipulation of Settlement, Ex. A (Brown Decl., Ex. 7); *In re Arena Pharms., Inc. S'holder Derivative Litig.*, No. 37-2010-00101051-CU-BT-CTL, slip op. (Cal. Super. Ct.-San Diego Cty. Dec. 16, 2011) (awarding approximately $1,100,000 in fees in a derivative action that settled for the following governance: enhanced management and the board oversight over disclosure controls and the company's public disclosures; regular reports to the Board regarding material communications with FDA; enhanced Board independence and limits on tenure; separation of Chairman/CEO or appointment of Lead Independent Director; enhanced training; enhancements to whistleblower practices; and enhanced claw-back provision) (Brown Decl., Ex. 8), and *Arena Pharms.* Stipulation of Settlement, Ex. A (Brown Decl., Ex. 9); *In re Invacare Derivative Litig.*, No. 1:11-cv-01893, slip op. (N.D. Ohio Nov. 15, 2012) (awarding $1,300,000 in fees in a derivative action that settled for the following governance: enhancements to Audit Committee oversight over the company's compliance with FDA regulatory requirements and the company's Medical Device Regulatory Compliance, including enhanced reporting by management to the Audit Committee; annual reporting to the Board; enhanced training; enhanced whistleblower policies) (Brown Decl.,

Ex. 10), and *Invacare* Stipulation of Settlement, Ex. C (Brown Decl., Ex. 11); *Westchester Putnam Cty. Heavy & Highway Laborers Local 60 Benefit Funds v. MacMillan* (brought on behalf of Stryker Corp.), No. 1:10-cv-00284-GJQ, slip op. (W.D. Mich. Nov. 29, 2012) (awarding $1,400,000 in fees in a derivative action that settled for the following governance: establishment of a board-level committee with oversight of regulatory affairs and quality assurance; enhanced board independence; appointment of Lead Independent Director with specified duties; enhanced director education; and increased access to information at shareholder meetings) (Brown Decl., Ex. 12), and *MacMillan* Stipulation of Settlement ¶2.1 (Brown Decl., Ex. 13)).

These cases, among others, support that Plaintiffs' Counsel's request for a Fees and Expenses Award of $610,000 is fair, reasonable, and adequate. Plaintiffs respectfully submit that the agreed-to Fees and Expenses Award is eminently reasonable in light of fees awarded in similar derivative settlements where valuable corporate governance reforms were obtained.

## 2.      Counsel's Qualifications, Experience, Skill, and Reputation

Plaintiffs' Counsel's experience, skill, and reputation further support the Fees and Expenses Award. As demonstrated in the firm resumes attached to the Plaintiffs' Counsel's respective declarations, Plaintiffs' Counsel are experienced litigators with substantial experience litigating shareholder derivative actions. (Brown Decl., ¶70.) Likewise, Defendants were represented by Fried, Frank, Harris, Shriver & Jacobson LLP and Paul, Weiss, Rifkind, Wharton & Garrison, LLP, leading corporate defense firms whose lawyers zealously and effectively represented their interests. (*Id.*, ¶71.) Thus, the Parties' negotiations regarding the Fees and Expenses Award were based upon a knowledgeable and thorough analysis of what an appropriate fee would be in light of the benefits achieved. (*Id.*, ¶72.) The end result of the Parties' informed negotiations, with the assistance of the Mediator, is entitled to great weight in evaluating Plaintiffs' Counsel's request for approval of the agreed-to Fees and Expenses Award.

### 3.    The Complexity and the Duration of the Litigation

The complexity of the Derivative Action supports the Fees and Expenses Award, as "the substantial risks plaintiffs face[] in establishing liability and damages . . . weigh in favor of approval of both the settlement and the fee award." *In re AT&T Corp. Sec. Litig.*, 455 F.3d at 171; *see also In re Royal Dutch/Shell Transp. Sec. Litig.*, No. 04-374 (JAP), 2008 WL 9447623, at \*28 (D.N.J. Dec. 8, 2008) (finding the complex nature of securities class actions weighs in favor of approving the requested fee). As discussed in Section VI.C.4, *supra* at 15, derivative actions "[are] 'notoriously difficult and unpredictable.'" *Maher*, 714 F.2d at 455. Especially in cases where the theory of liability is based on Defendants' oversight responsibility, like in the Derivative Action, establishing liability is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d at 967. As such, Defendants arduously deny any liability whatsoever in the Stipulation. (Stipulation, ¶S.) This factor weighs in favor of finding the agreed-to Fees and Expenses Award to be reasonable.

### 4.    Amount of Time Devoted

Courts within the Third Circuit have the discretion to employ a lodestar "cross-check" to determine reasonable fees in shareholder derivative actions. *See Gen. Motors*, 55 F.3d at 821. The lodestar cross-check need not entail "mathematical precision" or "bean-counting" and is "not a full-blown lodestar inquiry." *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 306-07 n.16 (3rd Cir. 2005); *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 342 (3rd Cir. 1998) (finding no abuse of discretion where district court "reli[ed] on time summaries, rather than detailed time records").

Plaintiffs' Counsel dedicated significant investments of time and money to the Derivative Action and the Demand, including a collective 905.8 hours spent by counsel and their professional

staff, and approximately $3,659.04 in expenses. (Brown Decl., ¶¶74-76.) Plaintiffs' Counsel's lodestar is $661,435.75. (*Id.*)

As such, Plaintiffs' Counsel's requested Fees and Expenses Award of $610,000, which, after deducting $3,659.04 in expenses and three Plaintiff Service Awards of $2,000, represents a lodestar multiplier of approximately 0.91, a fractional, or "negative," multiplier, which is well below the range of multipliers commonly awarded in derivative actions with comparable governance-only settlements. *See, e.g.*, *In re Ocean Power Technologies, Inc.*, C.A. No. 12-6172, 2016 WL 6778218, at *25 (D. N.J. Nov. 15, 2016) (approving a lodestar multiplier of over 2.5, and recognizing that "in this circuit, multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied"); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051-53 (9th Cir. 2002) (listing 23 large shareholder settlements and multipliers for each, in which the average multiplier is 3.28); *Burford v. Cargill, Inc.*, No. 05-0283, 2012 WL 5471985, at *6 n.1 (W.D. La. Nov. 8, 2012) (multipliers up to 4 are common); *Golebiowski v. Mega Life & Health Ins. Co.*, C.A. No. 3:04-cv-00831-G, 2005 U.S. Dist. LEXIS 614, at *8 (N.D. Tex. Jan. 13, 2005) (4 multiplier is reasonable); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589-90 (E.D. Pa. 2005) (6.96 multiplier is reasonable); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) ("multipliers of between 3 and 4.5 have become common").

Thus, a lodestar cross-check supports finding the Fees and Expenses Award reasonable.

### 5.    The Contingent Nature of the Fees Supports Reasonableness of the Fees and Expenses Award

Courts also recognize that attorneys are entitled to a substantially larger fees when the fees are contingent upon the outcome of the case rather than when it is contractually fixed on an hourly basis. *Lindy Bros. Builders of Phila. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 168 (3rd Cir. 1973). Here, Plaintiffs' Counsel achieved the successful resolution of the Derivative

Action on a fully contingent basis, and in the face of considerable litigation hurdles and risks. As such, they faced the very real possibility that they may recover nothing for the 905.8 hours of firm time and thousands of dollars in upfront costs invested in this litigation. (Brown Decl., ¶79.) Thus, the contingent nature of Plaintiffs' Counsel's representation in the Derivative Action further supports finding the agreed-to and Fees and Expenses Award reasonable.

### C.     The Requested Plaintiff Service Awards for Plaintiffs Are Reasonable

Plaintiffs also respectfully request Court approval of Plaintiff Service Awards to be paid to each of the two Plaintiffs and Merkwan in an amount of $2,000, to be paid out of the Fees and Expenses Award approved by the Court. (Stipulation, ¶20.) The requested Plaintiff Service Awards are customary and reasonable in recognition of the Plaintiffs' dedication to the Derivative Action and the Demand and of the substantial benefits they helped create for Evoqua. *See, e.g.*, *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 535 (E.D. Pa. 1990) (approving $5,000 award to each of the representative plaintiffs); *In re Cendant Corp. Derivative Action Litig.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) (approving award of $25,000 to the lead plaintiff). The Plaintiff Service Awards should therefore be approved.

## VIII.   CONCLUSION

The Settlement meaningfully addresses the issues Plaintiffs raised concerning Evoqua's disclosure controls and accounting practices, and the Settlement therefore provides an excellent resolution for Evoqua of this Consolidated Action and the Demand, matters of substantial complexity and cost.  Plaintiffs respectfully request that the Court finally approve the Settlement.

Respectfully submitted,

Dated: September 28, 2021

**LAW OFFICE OF LEON AUSSPRUNG, MD, LLC**

 */s/ James E. Hockenberry*
James E. Hockenberry (P.A. I.D. 91133)
1800 John F. Kennedy Boulevard, Suite 1500
Philadelphia, PA 19103
Telephone: (215) 717-0744
888-800-5731 (f)
JH@aussprunglaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown (admitted *pro hac vice*)
767 Third Avenue, Suite 2501
New York, New York 10017
Telephone: (516) 922-5427
tbrown@thebrownlawfirm.net
*Co-Lead Counsel for Plaintiffs*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (admitted *pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
pkim@rosenlegal.com
*Co-Lead Counsel for Plaintiffs*

26